**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **CHARLES W. HUGHES CONSTRUCTION, LLC,** on behalf of itself and all others similarly situated,<br><br>*Plaintiff,*<br><br> v.<br><br>**SIKA AG;**<br>**SIKA CORPORATION;**<br>**CHRYSO, INC.;**<br>**GCP APPLIED TECHNOLOGIES INC.;**<br>**COMPAGNIE DE SAINT-GOBAIN S.A.;**<br>**MASTER BUILDERS SOLUTIONS**<br>   **ADMIXTURES US, LLC;**<br>**MASTER BUILDERS SOLUTIONS**<br>   **DEUTSCHLAND GMBH;**<br>**CINVEN LTD.;**<br>**CINVEN, INC.;**<br>**THE EUCLID CHEMICAL COMPANY; and**<br>**RPM INTERNATIONAL INC.,**<br><br>*Defendants* | **Case No. 24-cv-460**<br><br>**JURY TRIAL DEMANDED** |

<u>**CLASS ACTION COMPLAINT**</u>

Indirect Purchaser Plaintiff Charles W. Hughes Construction, LLC ("Plaintiff") brings this action on behalf of itself individually and on behalf of a plaintiff class consisting of all indirect purchasers of CCAs from a Defendant or co-conspirator in the United States from at least January 1, 2018, until the present (the "Class Period"). Plaintiff brings this action against Defendants for injunctive relief and treble damages under the antitrust laws of the United States and for damages under various state antitrust, consumer protection and unfair trade practices, and unjust enrichment laws, and demands a trial by jury. Plaintiff alleges facts regarding itself based on personal knowledge, and all other facts below on information and belief after an investigation by counsel.

## NATURE OF THE ACTION

1.    This civil antitrust action seeks damages and injunctive relief arising out of the collusive and concerted restraint of trade in CCAs by the Defendants—all of whom are direct competitors and leading manufacturers of CCAs in the United States—during the Class Period. But for Defendants' and their co-conspirators' collusive conduct as alleged herein, Plaintiff and members of the class Plaintiff seeks to represent would not have paid—and would not continue to pay—artificially inflated prices for CCAs. CCA is a commodity product sold in powdered and liquid forms. Defendants' scheme included both price increases and the imposition of surcharges on CCAs sold in the United States.

2.    This lawsuit arises from Defendants' unlawful agreement to fix the prices for (a) concrete admixtures, (b) cement additives, and (c) admixtures for mortar (collectively, "CCAs"). CCAs, which can be either liquid or powdered, are added to concrete, cement, and mortar before or during the aggregate's mixing with water to give the finished product certain qualities, such as reducing the amount of water needed for the aggregate to set, reducing (or increasing) set time, reducing shrinkage, stabilizing or preventing cracking, and inhibiting corrosion.[1] Globally, the market for CCAs reached more than $18 billion in 2020[2] and $27 billion in 2022.[3]

3.    Defendants are four separate corporate families: (i) the "Sika" Defendants,

---

[1]    The Constructor, 15 Types of Admixtures Used in Concrete, https://theconstructor.org/concrete/types-concrete-admixtures/5558/#:~:text=15.%20Coloring%20Admixtures%20%20%20Admixture%20%20,%20%20Green%20%20 203%20more%20rows%20.

[2]    Fortune Business Insights, Concrete Admixtures Market Size (Jan. 2020), https://www.fortunebusinessinsights.com/concrete-admixtures-market-102832.

[3]    Global News Wire, Concrete Admixture Market is Projected to reach US $27.5 Billion with a Share of 36.1%, by 2032 (July 13, 2022), https://www.globenewswire.com/en/news-release/2022/07/13/2479255/0/en/Concrete- Admixture-Market-is-projected-to-reach-US-27-4-Billion-with-a-Share-of-36-1-by-2032-Future-Market-Insights- Inc.html.

comprised of Swiss corporation Sika AG and its wholly-owned U.S. subsidiary, New Jersey-based Sika Corporation; (ii) the "Saint-Gobain Group" Defendants, comprised of the French conglomerate Compagnie de Saint-Gobain S.A and two wholly-owned U.S.-based subsidiaries it controls, namely Chryso, Inc., headquartered in Texas; Georgia-based GCP Applied Technologies Inc.; and its Saint-Gobain North America division, based in Malvern, Pennsylvania; (iii) the "Cinven Group" Defendants, comprised of British corporation Cinven Ltd., its two wholly-owned U.S. subsidiaries, New York City-based Cinven, Inc., and Ohio-based Master Builders Solutions Admixtures US, LLC, and Cinven Ltd.'s wholly-owned German Subsidiary, Master Builders Solutions Deutschland GmbH; and (iv) the "RPM Group" Defendants, comprised of RPM International Inc., and its wholly-owned subsidiary The Euclid Chemical Company, both of which are based in Ohio. These four defendant families manufacture and sell the majority of CCAs sold in the United States. Defendants' scheme included both price increases and the imposition of surcharges on CCAs sold in the United States.

4.    As detailed below in Section IV, Plaintiff and the Class first became aware of Defendants' unlawful scheme on October 17, 2023, when the European Commission ("EC") announced that it had, together with the United Kingdom's Competition and Markets Authority ("CMA") and the Turkish Competition Authority ("TCA"), carried out surprise antitrust inspections (also known as "dawn raids") of "companies active in the construction chemicals sector in several Member States."[4]

5.    Both the EC and CMA have confirmed that they are working with the United States Department of Justice's Antitrust Division ("DOJ") in connection with these dawn raids, thus indicating that the anticompetitive conduct in question also extended into this country.

---

[4]    *See* https://ec.europa.eu/commission/presscorner/detail/en/ip_23_5061.

6.      That day, the CMA released a statement that it had "launched an investigation . . . into suspected anti-competitive conduct relating to the supply of chemical admixtures and additives for use in concrete, cement, mortars and related construction products in the UK" and that its "investigation concern[ed] a suspected infringement or infringements of Chapter I [of the Competition Act of 1998] involving a number of suppliers of these chemicals and some industry bodies."[5] According to the CMA, Chapter I of the Competition Act of 1998 "prohibits agreements and concerted practices between undertakings (e.g., businesses) and decisions by associations of undertakings (e.g., trade associations) which have as their object or effect the prevention, restriction or distortion of competition within the UK and which may affect trade within the UK."[6] That is, Chapter I of the Competition Act of 1998 is the UK's equivalent to Section 1 of the Sherman Act.

7.      On October 18, 2023, Sika, the Saint-Gobain Group, and the Cinven Group publicly confirmed that they were targets of the global antitrust investigation described directly above.[7] The next day, it was reported that both Sika and the Saint-Gobain Group were cooperating with global antitrust authorities,[8] and that Sika had been in contact with the DOJ.[9]

8.      The CCA market is highly susceptible to collusion: four Defendants control more

---

[5]     *See* https://www.gov.uk/government/news/cma-launches-investigation-into-the-supply-of-chemicals-for-use-in-construction-industry.

[6]     *See* https://www.gov.uk/government/publications/guidance-on-horizontal-agreements.

[7]     *See* https://www.lexology.com/pro/content/update-sika-saint-gobain-and-cinven-owned-business-targeted-in-cross-border-cartel-probe.

[8]     *See* https://www.constructionnews.co.uk/legal/competition-regulators-probe-concrete-additive-firms-19-10-2023/.

[9]     *See* ttps://www.icis.com/explore/resources/news/2023/10/18/10935016/eu-uk-turkey-authorities-launch-construction-chems-antitrust-investigation/.

than 80% of the CCA market, there are high barriers to entry, no substitute products available, and the demand for CCAs is inelastic.

9.      Beginning in 2017, Defendant St. Gobain and Sika embarked on a joint buying spree, acquiring more than a half-dozen of their CCA competitors, who threatened their ability to charge supracompetitive prices for CCAs sold indirectly to Plaintiff and other class members. This agreement was aided and abetted at all times by the Cinven Group, with the RPM Group thereafter joining the conspiracy. As Defendant Sika A.G. told investors in its 2022 Annual Report, it had "consolidate[d] fragmented [market segments]" to strengthen its core business.[10]

10.     As Defendants continued to consolidate the CCA market and with no meaningful check on their pricing power, they instituted price increases on CCAs, and surcharges on top of those price increases, including shipping surcharges and raw material surcharges.

11.     Defendants have an understanding that they will not undercut one another on the one thing they can compete on, price. For example, one industry analyst, in discussing at least the third price increase announced by Sika in 2021 ("We are going to increase prices further. We have increased prices in January and we will do it again in March"),[11] stated, "They are not losing sales when increasing prices because competitors will also not sell at lower prices."[12] Similarly, Frank Sullivan, the Chairman, President, and CEO of Defendant RPM International, Inc. admitted on an earnings call in July of 2023 that it was charging too much for its CCAs but that the company (trusting that it would not be undercut on price) "held our pricing and held our

---

[11] *See* https://www.reuters.com/article/sika-results-materials/sika-raises-prices-to-counter-jump-in-raw-material-costs-idUSZ8N1UN01Y/.

[12] Update 2-Chemicals Group Sika Tackles Higher Costs by Raising Prices, https://www.reuters.com/article/sika- results/update-2-chemicals-group-sika-tackles-higher-costs-by-raising-prices-idUSL4N2RI0XW (last updated Oct. 21, 2021).

discipline" and, as a result, reaped substantial supracompetitive profits on its CCAs.[13]

12.    Moreover, Defendants' claimed justification for these price hikes and surcharges is pretextual. The spike in raw material and shipping costs was either non-existent or short lived. In comparison, Defendants' price increases, including surcharges, on CCAs have been both extreme and persistent.

13.    As discussed below, Defendants' conspiracy was facilitated through their shared membership in numerous trade associations.

14.    And in the United States, Defendants are "super sponsors" of the National Ready-Mix Concrete Association ("NMRCA"), a trade association founded in 1930, long before most of the construction chemicals at issue came into existence. While many of NMRCA's members are buyers who bought CCAs directly from Defendants and thus were harmed by Defendants' anticompetitive conduct, the NMRCA provided Defendants with yet a further opportunity to meet and collude among themselves under the guise of participation in a trade association. The NMRCA also provided Defendants with benchmarking analyses that Defendants could misuse to further their efforts to fix CCA prices.

15.    Beginning no later than January 1, 2018, Defendants entered into an agreement to consolidate their control over the global CCA market and thereafter, fix the prices for CCA. This agreement, which was effectuated through, among other things, Defendants' continual, close interactions with each other in connection with several inter-defendant sales and acquisitions. For example, during the Class Period: (1) the Saint-Gobain Group bought Defendant Chryso, Inc. from the Cinven Group; (2) Sika sold Master Builders, which was eventually split into two entities, Defendants Master Builders Deutschland

---

[13]    *See* Q4 2023 RPM International Inc. Earnings Call Transcript (July 26, 2023), https://www.rpminc.com/media/4837/rpm-q4-23-transcript.pdf.

GmbH and Master Builders Solutions Admixtures US, LLC, both now wholly-owned subsidiaries of Defendant Cinven Ltd.; and (3) the RPM Group purchased Defendant Chryso, Inc.'s cement grinding additives business from the Saint-Gobain Group. These transactions gave the Defendants a unique opportunity to obtain and exchange highly sensitive competitive information regarding pricing, production, and sales territories.

16.     This rapid industry consolidation, and Defendants' effective elimination of their independent competitors, helped cement Defendants' cartel, which in turn resulted in Plaintiff and members of the Class paying supra-competitive prices for CCAs in the United States. Through this action, Plaintiff, on behalf of itself and members of the Class, seek to recover the overcharges they paid to Defendants.

## JURISDICTION AND VENUE

17.     Plaintiff brings this action under Section 16 of the Clayton Act (15 U.S.C. § 26) to secure injunctive relief against defendants for violating Section 1 of the Sherman Act (15 U.S.C. § 1). Plaintiff also brings state law class claims on behalf of all the classes to recover actual and/or compensatory damages, double and treble damages as permitted, pre- and post-judgment interest, costs, and attorneys' fees for the injury caused by Defendants' conduct and increasing the price of CCAs. Plaintiff seeks damages exceeding $5,000,000, and there are members of each Class which are citizens of a different state than the defendants. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

18.     Venue is proper in this District pursuant to Sections 4, 12, and 16 of the Clayton Act (28 U.S.C. §§ 15, 22, and 26), and pursuant to 28 U.S.C. § 1391(b), (c), and (d), because, at all times relevant to the Complaint, one or more of the Defendants resided, transacted business, was found, or had agents in this District, and a substantial portion of the affected interstate trade and commerce described in this Complaint was carried out in this District.

19.     This Court also has personal jurisdiction over each Defendant because, *inter alia*, each Defendant: (a) transacted business throughout the United States, including in this District; (b) manufactured, sold, shipped, and/or delivered substantial quantities of CCAs throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; or (d) engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including in this District.

20.     The activities of Defendants, as described herein, were within the flow of, were intended to, and did have direct, substantial, and reasonably foreseeable effects on, the foreign and interstate commerce of the United States.

## PARTIES AND UNNAMED CO-CONSPIRATORS

### A.     Plaintiff

21.     Plaintiff Charles W. Hughes Construction, LLC is a North Carolina limited liability company with its principal place of business in La Grange, North Carolina. During the Class Period, Plaintiff Charles W. Hughes Construction, LLC purchased CCAs manufactured by one or more of the Defendants at supra-competitive prices other than directly from one or more of the Defendants, and suffered antitrust injury and damages as a material, direct, and proximate result of Defendants' conspiracy and wrongful acts in furtherance thereof.

### B.     Defendants

#### 1.     The Sika Defendants

22.     Defendant Sika AG is a Swiss corporation with its primary place of business at Zugerstrasse 50 Baar, Zug, 6341 Switzerland. During the Class Period, Sika AG manufactured and sold CCAs around the world, including in the United States, both directly and through its wholly-owned U.S. subsidiary and co-defendant Sika Corporation, and/or through its predecessors,

affiliates, or subsidiaries.

23.    Defendant Sika Corporation is a New Jersey corporation with its primary place of business at 201 Polito Ave Lyndhurst, New Jersey, 07071. Sika Corporation has approximately thirty-six (36) locations throughout North America, including twenty-eight in the United States and three (3) in this District. During the Class Period, Sika Corporation manufactured and sold CCAs in the United States, directly and/or through its predecessors, affiliates, or subsidiaries. Defendant Sika AG controls Sika Corporation both generally and with respect to the conduct of Sika Corporation in furtherance of the unlawful acts alleged in this Complaint.

### 2.    The Saint-Gobain Group Defendants

24.    Defendant Saint-Gobain S.A. is a French corporation with its primary place of business at Tour Saint Gobain,12 Place De L Iris Courbevoie, Ile-De-France, 92400 France. During the Class Period, Saint-Gobain S.A. manufactured and sold CCAs around the world, including in the United States, both directly and through the other members of the Saint-Gobain Group, including its two wholly owned subsidiaries Chryso, Inc., and GCP Applied Technologies Inc., and its Saint-Gobain North America division.

25.    Defendant Chryso, Inc. is a Michigan corporation with its primary place of business in Rockwall, Texas. During the Class Period, Chryso, Inc. manufactured and sold CCAs in the United States, directly and/or through its predecessors, affiliates, or subsidiaries.  Defendant Saint-Gobain S.A. controls Chryso, Inc. both generally and with respect to the conduct of Chryso, Inc. in furtherance of the unlawful acts alleged in this Complaint.

26.    Defendant GCP Applied Technologies, Inc. ("GCP") is a Georgia corporation with its primary place of business in Alpharetta, Georgia. Defendant Saint-Gobain S.A. controls GCP both generally and with respect to the conduct of GCP in furtherance of the unlawful acts alleged in this Complaint.

### 3.    The Cinven Group Defendants

27.    Defendant Cinven Ltd. is a British corporation with its primary place of business at 21 St. James's Square, London. Cinven Ltd., through its through its wholly owned U.S. subsidiary and co-defendant Master Builders Solutions Admixtures US, LLC, and its wholly-owned German subsidiary and co-defendant, Master Builders Solutions Deutschland GmbH, manufactures and sells CCAs around the world, including in the United States.

28.    Defendant Cinven, Inc. is a New York corporation with its primary place of business at 12 East 49th Street in Manhattan, within this District. Cinven Inc., through its sister companies and co-defendants Master Builders Solutions Admixtures US, LLC Master Builders Solutions Deutschland GmbH, manufactures and sells CCAs around the world, including in the United States and its territories, through its predecessors, affiliates, or subsidiaries.  Defendant Cinven Ltd. controls Cinven, Inc. both generally and with respect to the conduct of Cinven, Inc. in furtherance of the unlawful acts alleged in this Complaint.

29.    Defendant Master Builders Deutschland GmbH is a German corporation with its primary place of business in Mannheim, Germany. During the Class Period, Master Builders Deutschland GmbH manufactured and sold CCAs around the world, including in the United States and its territories, both directly and through its predecessors, affiliates, or subsidiaries. Defendant Cinven Ltd. controls Master Builders Deutschland GmbH both generally and with respect to the conduct of Master Builders Deutschland GmbH in furtherance of the unlawful acts alleged in this Complaint.

30.    Defendant Master Builders Solutions Admixtures US, LLC is a Delaware corporation with its primary place of business in Beachwood, Ohio, 44122. Master Builders Solutions Admixtures US, LLC has approximately three (3) locations throughout North America, including two (2) in the United States. During the Class Period, Master Builders Solutions

Admixtures US, LLC manufactured and sold CCAs in the United States and its territories, directly and/or through its predecessors, affiliates, or subsidiaries. Defendant Cinven Ltd. controls Master Builders Solutions Admixtures US, LLC both generally and with respect to the conduct of Master Builders Solutions Admixtures US, LLC in furtherance of the unlawful acts alleged in this Complaint.

### 4. The RPM Group Defendants

**31.** Defendant RPM International, Inc. is a Delaware corporation with its primary place of business in Medina, Ohio. During the Class Period, RPM International, Inc. manufactured and sold CCAs around the world, including in the United States and its territories, both directly and through its predecessors, affiliates, or subsidiaries, including its wholly owned subsidiary and co-defendant The Euclid Chemical Company.

**32.** Defendant The Euclid Chemical Company is an Ohio corporation with its primary place of business in Cleveland. During the Class Period, The Euclid Chemical Company manufactured and sold CCAs around the world, including in the United States and its territories. Defendant RPM International, Inc. controls The Euclid Chemical Company both generally and with respect to the conduct of The Euclid Chemical Company in furtherance of the unlawful acts alleged in this Complaint.

**33.** The acts alleged against the Defendants in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of Defendants' businesses or affairs.

**34.** Various persons and/or firms not named as Defendants herein may have participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.

**35.** Each Defendant acted as the principal, agent, or joint venture of, or for, other

Defendants with respect to the acts, violations, and common course of conduct alleged by Plaintiff.

## FACTUAL ALLEGATIONS

### A.    CCAs, Generally

#### 1.    CCAs Are Necessary Input in Cement, Concrete, and Mortar

36.    CCAs are added to cement, concrete, and mortar primarily to reduce the cost of concrete construction; to modify the properties of hardened concrete; to ensure the quality of concrete during mixing, transporting, placing, and curing; and to overcome certain emergencies during concrete operations.[14]

37.    Concrete is an important resource for all kinds of construction projects in the United States. Just over half of the low-rise (less than three-stories in height) structures in the United States are built out of concrete.[15]

38.    Cement is a binding agent made from limestone and clay and is also used extensively in building here in the United States. Cement production in the United States reached its highest level in more than a decade in 2022, amounting to 95 million metric tons.[16]

39.    Mortar is a combination of cement and sand and is primarily used to hold ready-made building units (like bricks or blocks) in place.

40.    CCAs are integral to the construction of America's infrastructure, including residential, commercial, and industrial buildings, roads, bridges, tunnels, and airports.[17] Indeed,

---

[14]    *See* https://www.cement.org/cement-concrete/concrete-materials/chemical-admixtures#:~:text=Producers%20use%20admixtures%20primarily%20to,certain%20emergencies%20during%20concrete%20operations.

[15]    *See* https://www.cement.org/cement-concrete/paving/buildings-structures.

[16]    *See* https://www.statista.com/statistics/273367/consumption-of-cement-in-the-us/.

[17]    CMA, Phase 1 Referral Decision in Sika-Master Builders Merger, ¶ 4 (Sept. 23, 2022).

the Australian Competition and Consumer Commission stated that "Chemical admixtures are an essential component in the production of concrete and cement"[18] and the CMA recently concluded that CCAs are "an essential input in the production" of cement, concrete, and mortar.[19]

41.    Moreover, Paul Hälg, Sika's Chair of the Board of Directors stated that "A significant proportion of our [admixture] products are system critical."[20]

42.    The essential nature of CCAs is shown below in a depiction from the Saint-Gobain Group, which illustrates the variety of projects using concrete, cement, and/or mortar incorporating CCAs:



---

[18]    *See*    https://www.accc.gov.au/media-release/sikas-proposed-acquisition-of-mbcc-group-not-opposed-subject-to-global-divestiture.

[19]    CMA, Phase 1 Referral Decision in Sika-Master Builders Merger, ¶ 4 (Sept. 23, 2022).

[20]    *See* https://reports.sika.com/en/annual-report-2022/interview-with-the-ceo.

### 2.    Types of CCAs

**43.**    As noted above, there are mainly three types of CCAs: (a) chemical admixtures for cement, (b) chemical admixtures for concrete, and (c) admixtures for mortar. The CMA has described the uses for each as follows:

> Chemical admixtures for cement are added to cement in order to reduce the amount of energy required to grind the cement (ie grinding aids) as well as to improve the performance of the cement (ie performance enhancers or quality improvers);
>
> Chemical admixtures for concrete are added to improve the properties of concrete or wet mortar, including super-plasticizers, plasticizers, air entrainers, retarders and accelerators; and
>
> Other chemical admixtures include admixtures for dry mortar and certain admixtures for wet mortar that are not also used for concrete, for example as they increase the adhesion properties of mortar but do not reduce the amount of water required.[21]

**44.**    Manufacturers of CCAs use the same equipment and chemicals to produce these CCAs, so they can quickly and cost-effectively shift production from one category of CCA to another.[22]

### 3.    How CCAs Are Sold and Who Buys Them

**45.**    Most CCAs are sold in ready-to-use liquid form and can be added to the aggregate either at the plant where the aggregate product is produced (e.g., ready-made concrete mix) or at the jobsite where it is to be used.[23]

---

[21]    CMA, Phase 1 Referral Decision in Sika-Master Builders Merger, FN 57 (Sept. 23, 2022).

[22]    CMA, Phase 1 Referral Decision in Sika-Master Builders Merger, FN 57 (Sept. 23, 2022).

[23]    Sika, Corporate Governance (2022), https://www.sika.com/dam/dms/corporate/media/glo-ar-2022-corporate- governance.pdf.

**46.**     An example of how CCAs are packaged and sold is shown below:[24]



### SikaMix AE-6

**Water Repelling and Efflorescence Reducing Admixture**

SikaMix AE-6 is a high performance water repelling and efflorescence reducing admixture for various concrete applications. SikaMix AE-6 is formulated to meet ASTM E514 "Standard Test Method for Water Penetration and Leakage Through Masonry."

SikaMix AE-6 is suitable for the production of drycast and wet cast concrete.   Use of SikaMix AE-6 results in:

✓ Improved water repellency.

✓ Reduced efflorescence.

✓ Improved color vibrancy and pigment efficiency.

⬇ **PRODUCT DATA SHEET**     ⬇ **SAFETY DATA SHEET**     **SHOW ALL DOCUMENTS**

**47.**     Purchasers of CCAs operate in the construction and industrial sectors and include producers of ready-mixed concrete, shotcrete,[25] and pre-cast concrete.[26] [27]

**48.**     In general, CCAs are sold by Defendants directly to suppliers of ready-mix concrete and masonry, as well as to distributors.

**B.     The Market for CCAs in the United States and Its Territories**

**49.**     The United States market for CCAs is a national market accounting for approximately $3 billion in yearly sales.[28]

**50.**     CCAs are commodity products and Defendants compete solely on price. For

---

[24]    Sika USA, SikaMix AE-6, https://usa.sika.com/en/construction-products/concrete/concrete-admixtures/dry-cast- admixtures/efflorescence-control/sikamix-ae-6.html.

[25]    Shotcrete (or gunite) is a type of ready-mixed concrete that, instead of being poured and spread, is fed through a hose and applied using a high-pressure sprayer. It is typically used for concrete walls, such as in tunnels.

[26]    Sika USA, A Complete Range of Concrete Admixtures, https://usa.sika.com/en/construction/concrete/concrete- admixtures.html.

[27]    CMA, Phase 1 Referral Decision in Sika-Master Builders Merger, ¶ 49 (Sept. 23, 2022).

[28]    *See* https://www.mordorintelligence.com/industry-reports/north-america-concrete-admixtures-market.

example, during the CMA's review of the proposed merger between Sika and MBCC, the

companies submitted to the CMA that:

> [T]here is no closeness of competition concern in this case because there is no differentiation in the supply of chemical admixtures for cement and concrete. In particular: (a) Chemical admixtures are commodities and homogenous products, not differentiated products. Any differentiation between suppliers is based on various add-on services and is marginal at best as these services are easily replicated by competitors and generally all suppliers offer such services. Competition between suppliers is largely based on price. (b) The Parties do not exercise an important competitive constraint on one another due to the homogenized and undifferentiated nature of the products, with neither Party being a 'maverick' player. (c) There is no innovation concern in this case. 'True' innovation and R&D in the supply of chemical admixtures is extremely limited, and the Parties' investments in innovation are not comparable to dynamic competition between them, as they are aimed at improving their respective range of products, for example to reduce water usage and to create more sustainable products, rather than developing wholly new technologies or products.[29]

    **51.**    Defendants are the dominant manufacturers and sellers of CCAs in the World, and

in the United States and its territories. On information and belief, Plaintiff's estimate of

Defendants' market share in the United States is between eighty and ninety percent (80% to

90%).[30]

    **52.**    Defendants manufacture and sell numerous CCAs in the United States and its

territories, as well as around the world. Purchasers of CCAs in the United States and its territories

import them directly from the foreign Defendants (e.g., Compagnie de Saint-Gobain S.A., Sika

AG, and MBSD) and buy them from their domestic subsidiaries (e.g., Sika Corp., Chryso, GCP,

and MBSA).[31] The below figures list some of the CCAs sold in the United States and its territories

---

    [29]    *See* https://assets.publishing.service.gov.uk/media/632c80f78fa8f51d2cfed942
/220727_Sika-MBCC_Decision_FINAL2.pdf, para 78(a)-(c).

    [30]    CMA, Phase 1 Referral Decision in Sika-Master Builders Merger, ¶ 75 (Sept. 23, 2022).

    [31]    CMA, Phase 1 Referral Decision in Sika-Master Builders Merger, ¶ 124(b) (Sept. 23, 2022).

by Defendants.

**53.** CCAs sold by Sika in the United States and its territories:[32]

| Water-Reducers | Powdered Admixtures: | Air Entrainers: Sika® Air | Drycast Admixtures: |
|---|---|---|---|
| Plastocrete® 161 | Sika® ViscoCrete®-125 P | Sika® AEA-14 | SikaMix® PL-100 |
| Plastocrete® 10N | Sika® ViscoCrete®-225 P | Sika® Multi Air-25 | SikaMix® BF3 |
| Plastocrete® 250 | Workability | Sika® Air-260 | SikaMix® HC-300 |
| Mid-Range Water-Reducers: | Retaining Admixture Sika® | Sika® Air-360 | SikaMix® AE-3 |
| SikaPlast®-200 | ViscoFlow®-2020 | Corrosion Inhibitors: | SikaMix® AE-6 |
| SikaPlast®-300 GP | Retarders & | Sika® FerroGard®-901S | SikaMix® W-10 |
| Sikament® AFM | Hydration Control:: | Sika® CNI | SikaMix® W-10 M |
| | | Shrinkage Reduction | |
| High-Range Water-Reducers: | Plastiment® XR | Sika® Control-220 | Specialty Admixtures: |
| Sikament® 475 | Plastiment® | Sika® Control-75 | Sikament®-100 SC |
| Sikament® 686 | SikaTard® 440 | Shrinkage Reduction/Compensation: | Sika® Stabilizer-4R |
| Sikament® 610 | | Sika® Control-NS | Sika® Lightcrete Powder |
| Sika® ViscoCrete®-1000 | Set Accelerators: | Silica FumeSikacrete®-950DP | Sika® Lightcrete Liquid |
| Sika® ViscoCrete®-2100 | SikaSet® NC | MetakaolinSikacrete® M-100 | Sika® Perfin-305 Shotcrete Accelerator: |
| Sika® ViscoCrete®-4100 | SikaSet® NC-4 | Alkali-Silica Reaction Mitigation | Sigunit®-L72 AF |
| Sika® ViscoCrete®-6100 | SikaSet® HE | Sika® Control ASR | Concrete Placement: |
| Sika® ViscoCrete®-2110 | Plastocrete® 161 HE | Watertight Applications: | Sika® Rugasol-S |
| Sikament® SPMN | Strength/Hardening Accelerators: | Sika® Watertight Concrete Powder | SikaFilm® |
| | Sika® Rapid-1 | Sika® WT-215 P | |
| | | | Concrete Fibers: SikaFiber® SikaFiber® Force |

**54.**    CCAs sold by Saint-Gobain Group (Chryso) in the United States and its territories:[33]

| Water Reducing - Plasticizing Admixtures: CHRYSO® PLAST GR 120 CHRYSO® PLAST GR 200 CHRYSO® PLAST GR 300 | CHRYSO® CURE HPE (WATER BASED CURING AGENT)  CHRYSO® DECO LAV P SERIES (POSITIVE SURFACE RETARDERS) |
|---|---|

[32]    *See* file:///C:/Users/Mkist/Desktop/Concrete%20Admixture%20Product%20Guide.pdf.
[33]    *See* https://marmoline.gr/en/categories/prostheta-skyrodematos-chryso/sybliromatika-ylika-skyrodetiseon/; https://www.chrysoinc.com/catalog/accelerator-ready-mix/.

| | |
|---|---|
| Super Plasticizing Admixtures:<br>CHRYSO® PLAST GR 80<br>CHRYSO® OPTIMA 74<br>CHRYSO® OPTIMA 76<br>CHRYSO® OPTIMA 206<br>CHRYSO® OPTIMA 234<br>CHRYSO® PREMIA 184<br><br>Admixtures For Special Applications:<br><br>CHRYSO® Air G500 (AIR ENTRAINING ADMIXTURE)<br><br>CHRYSO® FUGE B4 (WATER RESISTING ADMIXTURE)<br><br>CHRYSO® XEL 650 (SET ACCELERATING ADMIXTURE)<br><br>CHRYSO® SERENIS (SHRINKAGE REDUCING AGENT)<br><br>Demoulding:<br><br>CHRYSO® DEM DEV EKLA 20 (DELAYED MOULD RELEASE AGENT - VEGETABLE EMULSION) | LUMINESCENT PARTICLES FOR DECORATIVE CONCRETES<br><br>CHRYSO® CRACKSTOP M195 SERIES (SYNTHETIC POLYPROPYLENE MICRO-FIBERS)<br><br>CHRYSO®OMEGA<br>CHRYSO®EQUALIS<br>CHRYSO®PREMIA<br>CHRYSO®TERA<br>CHRYSO®SERENIS<br>FIBERS RANGE<br>CHRYSO®DEM RANGE<br>CHRYSO®QUAD<br>CHRYSO®TURBOCAST<br>CHRYSO®XEL<br>CHRYSO®MATURIX<br>CHRYSO®EASYDRAIN<br>CHRYSO®ENVIROMIX |

55.    CCAs sold by Saint-Gobain Group (GCP) in the United States and its territories:

| | | | |
|---|---|---|---|
| ADPRUFE 100 | Daracem 19 | DCI Corrosion Inhibitor | Quantec PL-450 |
| ADVA 120 | Daracem 50 | | Quantec PL-466 |
| ADVA 140M | Daracem 55 | DCI S Corrosion Inhibitor | Quantec PL-477R |
| ADVA 190 | Daracem 65 | | Quantec PL-488 |
| ADVA 195 | Daracem ML 330 | Eclipse 4500 | Quantec PL-490 |
| ADVA 198 | DaraFill | Eclipse Floor 200 | Quantec PL-495R |
| ADVA 405 | DaraFill BP | EXP 684 | Quantec Ultra-ES |
| ADVA 455 | DaraFill Dry | EXP 950 | RASIR |
| ADVA Cast 535 | Daragrind | FORCE 10,000D | TYTRO AE 250 |
| ADVA Cast 555 | Darapel | Gilco Accelerator | TYTRO AE 254 |
| ADVA Cast 575 | Darapel S80 | HEA2 | TYTRO MF 120 |
| ADVA Cast 585 | Daraset 400 | LGA Grinding Aid and Pack Set Inhibitor | TYTRO RC 430 |
| ADVA Cast 600 | Daraset 442 | | TYTRO RM 455 |
| ADVA FLEX | Daratard 152 | | TYTRO SA 530 |
| ADVA ITM750 | Daratard 17 | MIRA 110 | TYTRO WR 157 |

| | | | |
|---|---|---|---|
| Airalon | Daratard HC | MIRA 35 | V-MAR 3 |
| Airalon 3000 | Daravair 1000 | MIRA 62 | V-MAR F100 |
| CBP-2 | Daravair 1400 | MIRA 85 | V-MAR VSC500 |
| CLARENA AC1100 | Daravair AT30 | MIRA 95 | WRDA 20 |
| CLARENA MC2000 | Daravair AT60 | MTDA | WRDA 35 |
| CONCERA CP1028 | Daravair M | OPTEC EC-130 | WRDA 60 |
| CONCERA SA8080 | Darex AEA | Category | WRDA 64 |
| Daraccel | Darex AEA ED | OPTEC EC-140 | WRDA 79 |
| Daraccel M | Darex AEA EH | OPTEC EC-191 | WRDA 82 |
| Daracem 100 | Darex II AEA | OPTEC EC-250 | WRDA 86 |
| | | OPTEC EC-978 | WRDA PAVE 17 |
| | | OPTEC Paver | WRDA with Hycol |
| | | Enhancer | ZYLA 610 |
| | | OPTEVA® CBA | ZYLA 620 |
| | | Cement Additive | ZYLA 625 |
| | | OPTEVA® ESE | ZYLA 630 |
| | | Enhancing Additive | ZYLA 640 |
| | | OPTEVA TDA | ZYLA R |
| | | Quality Improvers | |
| | | Cement Additive | |
| | | PolarSet | |
| | | Postrite | |
| | | Quantec PL-400 | |

**56.** CCAs sold by Cinven Group in the United States and its territories:[34]

| | | |
|---|---|---|
| Water Reducers: | MasterRheobuild 1000 | MasterMatrix VMA 450 |
| MasterPozzolith 80 | Accelerators: | Workability-Retaining |
| MasterPozzolith 200 | MasterSet AC 534 | Admixture: |
| MasterPozzolith 210 | MasterSet FP 20 | MasterSure Z 60 |
| MasterPozzolith 700 | MasterSet AC 122 | Silica Fume and Corrosion |
| MasterPozzolith 322 | Retarders and Hydration | Inhibitors: |
| Mid-Range Water Reducers: | Control Admixtures: | MasterLife SF 100 |
| MasterPolyheed 1000 Series | MasterSet DELVO | MasterLife CI 222 |
| MasterPolyheed 997 | MasterSet R 100 | MasterLife CI 30 |
| MasterPolyheed 900 | MasterSet R 300 | Shrinkage and Crack |
| MasterPolyheed N | Air Entrainers and Foaming | Reducers: |
| High Range Water Reducers: | Agents: | MasterLife SRA 035 |
| MasterGlenium 1466 | MasterAir AE 400 | MasterLife CRA 007 |
| MasterGlenium 3030 | MasterAir AE 200 | Anti-Washout Admixture: |
| MasterGlenium 3400 | MasterAir AE 90 | MasterMatrix UW 450 |
| MasterGlenium 7500 | MasterCell 30 | Strength-Enhancing |

---

[34] *See* https://assets.master-builders-solutions.com/en-us/mbs-admixture-performance-guide.pdf.

| MasterGlenium 7511 MasterGlenium 7700 MasterGlenium 7710 MasterGlenium 7620/7920/7925 | Air-Detraining Admixture: MasterSure 1390 Viscosity-Modifying Admixtures: MasterMatrix VMA 358 MasterMatrix VMA 362 | Admixture: Master X-Seed 44 Master X-Seed 55 ASR Inhibitor: MasterLife ASR 30 Contact MBS Integral Waterproofing Admixtures: MasterLife 300D MasterLife 300C Admixture for Returned Concrete Treatment: MasterSuna RCT 323 |

57.    CCAs sold by the RPM Group in the United States and its territories:[35]

| ACCELERATORS: Chloride Accelguard® Standard Accelguard® HE Non-Chloride Accelguard® NCA Accelguard® 80 Accelguard® 90 Accelguard® G3 RETARDERS: Eucon™ Retarder 75 Eucon™ Retarder 100 Eucon™ LR Eucon™ NR Eucon™ 727 AIR ENTRAINERS: Eucon™ AEA-92 Eucon™ AEA-92S Eucon™ Air MAC6 Eucon™ Air MAC12 Eucon™ Air Mix Eucon™ Air Mix 200 Eucon™ Air Mix 250 Airex-L™ | Eucon™ WR 75 Eucon™ A+ Eucon™ DX MID-RANGE WATER REDUCERS: Eucon™ MR Eucon™ X15 Eucon™ X20 Eucon™ MRX Plastol™ 341 Plastol™ 341 Plastol™ 6420 HIGH-RANGE WATER REDUCERS: Eucon™ 37 Eucon™ 537 Eucon™ 1037 Plastol™ 341 Plastol™ 341S Plastol™ 5000 | SPECIALTY PRODUCTS: Air Detrainers Eucon™ Air-Down Eucon™ Air Out ASR Control Eucon™ Integral ARC Corrosion Inhibitors Eucon™ BCN Eucon™ CIA Flowable Fill/CLSM Eucon™ Easy Fill Hydration Stabilizers Eucon™ DS Eucon™ Stasis Integral Finishing Eucoshield™ Micro Silica Eucon™ MSA Rheology | Shrinkage Compensating Conex® Shrinkage Reducing Eucon™ SRA Floor Eucon™ SRA-XT Strength Enhancing Eucon™ Eco-Strength Waterproofing Eucon™ Vandex™ AM-10 Eucon™ Vandex™ AM-10L Weatherproofing Eucon™ Baracade WPT Workability Extending Plastol™ AMP-X² Plastol™ AMP- | Increte Color-Crete™ Liquid POWDERED ADMIXTURES: Accelguard® Set-Speed Eucon™ Dura-Plus Eucon™ Flow-Max Eucon™ Re-Duce Eucon™ Set-Stop Euco® THX |

[35]    See https://www.euclidchemical.com/fileshare/Literature/Euclid-Chemical-Admix-and-Fiber-Catalog.pdf.

| WATER REDUCERS: Eucon™ WR Eucon™ LW Eucon™ WR 91 Eucon™ NW Eucon™ WRX Eucon™ SE | Plastol™ 5700 Plastol™ 6200EXT Plastol™ 6400 Plastol™ 6420 Plastol™ 6425 Plastol™ SPC Plastol™ Ultra 209 | Modifiers Eucon™ AWA Eucon™ AWA-P20 Visctrol™ | X³ INTEGRAL COLORS 154 Increte Color-Crete™ Increte Color-Crete™ 7 for 28 Increte Color-Crete™ Granular | |

## C.    Global Antitrust Investigations into Defendants' Anticompetitive Conduct

**58.**    On October 17, 2023, the EC issued a press release stating that the Commission had carried out unannounced antitrust inspections in the construction chemicals sector:

> The European Commission is carrying out unannounced antitrust inspections at the premises of companies active in the construction chemicals sector in several Member States.

> The Commission has concerns that the inspected companies may have violated EU antitrust rules that prohibit cartels and restrictive business practices (Article 101 of the Treaty on the Functioning of the European Union).

> The construction chemicals concerned by the inspection are chemical additives for cement and chemical admixtures for concrete and mortar. These are ingredients that are added to cement, concrete and mortar to modify and improve their properties and provide them with specific qualities.

**59.**    The Commission officials were accompanied by their counterparts from the relevant national competition authorities of the Member States where the inspections were carried out. Today's inspections were conducted in coordination with the UK Competition and Markets Authority and the Turkish Competition Authority. The Commission has also been in contact with the United States Department of Justice, Antitrust Division.[36]

---

[36]    *See* https://ec.europa.eu/commission/presscorner/detail/en/ip_23_5061.

**60.** Later that  day, the CMA confirmed its participation in the investigation:

The CMA has launched an investigation into suspected anti-competitive conduct in relation to the supply of chemicals for use in the construction industry.

The Competition and Markets Authority (CMA) has reason to suspect anti-competitive behaviour has taken place involving a number of suppliers of these chemicals and some industry bodies. This conduct relates to the supply of chemical admixtures and additives which are an essential input for products like concrete, mortars and cement used in the construction industry.

The CMA is working closely with the European Commission, which has also launched an investigation into suspected anticompetitive conduct in the sector today. The CMA is also in contact with other authorities, including the United States Department of Justice, Antitrust Division.[37]

**61.**    On October 18, 2023, another industry article reported that the EU, UK,

Turkey authorities launched antitrust investigations. Among other things, the article stated:

The European Commission, UK Competition and Markets Authority, and Turkey's Competition Authority launched investigations, citing concern that companies in the sector may have violated EU antitrust rules prohibiting cartels and restrictive business practices. The Commission has also been in contact with the US Department of Justice. The focus of the investigation is on chemical additives for cement and admixtures for concrete and mortar. Sika said that authorities from the three involved state bodies had visited some of its premises, and that contact with US antitrust authorities has been established.[38]

**62.**    It was reported on October 18, 2023, that "Sika, Saint-Gobain and Masters

Business Solutions have confirmed they are involved in a cross-border cartel probe from

competition agencies in the UK, EU and Turkey over suspected cartel violations in the chemical

admixture market."[39]

---

[37]    *See See* https://www.gov.uk/government/news/cma-launches-investigation-into-the-supply-of-chemicals-for-use-in-construction-industry.

[38] *See* https://www.icis.com/explore/resources/news/2023/10/18/10935016/eu-uk-turkey-authorities-launch-construction-chems-antitrust-investigation/.

[39] *See* https://www.lexology.com/pro/content/update-sika-saint-gobain-and-cinven-owned-business-targeted-in-cross-border-cartel-probe.

63.     In a statement, Saint-Gobain said it was "aware of and cooperating with" competition law investigations in the EU, the UK and Turkey. The company confirmed that inspections had taken place at its construction chemicals business unit site in Turkey. It said this unit "is and has always been fully committed to competition law compliance and is cooperating with the investigations".[40].

64.     Sika confirmed that inspections had taken place into "suspected antitrust irregularities in the area of additives for concrete and cement," adding: "The fair operation of the markets is fundamental to Sika and we support this investigation with all our efforts and cooperate fully with the authorities."[41]

65.     On October 18, 2023, Masters Business Solutions part of the Cinven group of defendants also "confirmed they are involved in a cross-border cartel probe from competition agencies in the UK, EU and Turkey over suspected cartel violations in the chemical admixture market."[42]

66.     The inspections by the EC were not undertaken casually. Inspections are typically done by an order of the EC, and the EC must have "reasonable grounds for suspecting an infringement of the competition rules;" "[i]t must be borne in mind that the inspections carried out by the Commission are intended to enable it to gather the necessary documentary evidence to check the actual existence and scope of a given factual and legal situation concerning which it

---

[40]  *See* https://www.constructionnews.co.uk/legal/competition-regulators-probe-concrete-additive-firms-19-10-2023/.

[41]  *See* https://www.constructionnews.co.uk/legal/competition-regulators-probe-concrete-additive-firms-19-10-2023/.

[42]  https://www.lexology.com/pro/content/update-sika-saint-gobain-and-cinven-owned-business-targeted-in-cross-border-cartel-probe.

already possesses certain information."[43] The same is true for the TCA. Earlier this year, the Turkish Constitutional Court, the highest legal body for constitutional review in Turkey, held that the TCA may conduct a dawn raid after first obtaining a search warrant from a Turkish criminal court.

67.    This investigation follows several years in which the Defendants have generally consolidated the market for CCAs around the world, increased their profits while also imposing price increases and surcharges that are not adequately explained by market factors.

68.    These increases in profits during the Class Period are inconsistent with the Defendants' pretextual explanation that their price increases were intended to offset rising costs and are more consistent with the existence of a conspiracy to fix prices.

### D.    Defendants Effectuated Their Conspiracy Through Their Shared CCA Trade Associations

69.    In announcing the coordinated dawn raids, the CMA stated that the anticompetitive conduct at issue included not only individual companies, but also "some industry bodies." This is hardly surprising, given that Defendants share membership in a multitude of CCA trade associations around the World. This gave Defendants ample opportunity to meet and conspire in furtherance of their agreement to fix prices for CCAs.

70.    Defendants are members of various national CCA trade associations, which are in turn members of the European Federation of Concrete Admixtures Association ("EFCA"). EFCA is the umbrella global CCA trade association. According to its website, the EFCA is a partnership of 13 National Admixture Associations, formed in 1984, It is the voice of the European admixture producers. EFCA's total membership provides more than 80% of admixture

---

[43] Case No. T-135/09, *Nexans France SAS v. Comm'n*, 2012 E.C.R. 43, https://curia.europa.eu/juris/document/document.jsf?text=&docid=129701&pageIndex=0&doclang=EN&mode=lst &dir=&occ=first&part=1&cid=4406098.

sales within Europe and represents all the major admixture manufacturers. [44] The EFCA General Assembly is responsible for establishing policy, direction of the committee work, agreeing finances and promoting membership. It meets once per year usually in June. The members of the General Assembly also meet for an interim Board meeting, usually towards the end of each year. EFCA Members are partners under the Federation statutes and are National Admixture Associations made up of two or more companies in each country. Each National Association may delegate one or more representatives to the General Assembly but has only one National vote.

71.    The Executive Board, whose members are elected by the General Assembly, effectively manages operations on behalf of the Board by monitoring the progress of agreed action items by the committees, advising on the need to take action on new and developing issues and controlling finances, thus ensuring continuity of the Federation. The current EFCA Executive Board is made up of President Gianluca Bianchin (Italy), Vice Presidents Thomas Hirschi (Switzerland) and Osman Ilgen (Turkey), Sustainability Committee Chair Nihal Kinnersley (UK), and Technical Committee Chair Francesco Surico (Italy). Thomas Hirschi has worked at Sika since July of 2001 and has served as "Target Market Manager Concrete Waterproofing" for the company since January of 2017. Osman Ilgen was Managing Director at Chryso from March of 2015 through September of 2023 and has been a Vice President at Saint-Gobain Group since January of 2023. He also currently serves as President of KUB. Nihal Kinnersley has worked as a Product Stewardship Manager at GCP since March of 2016 and as a Product Stewardship Director at Saint-Gobain Group since July of 2023. Other members of the ECFA Board include Kai Salo of Sika, Claude Le Fur, who worked at Sika until July of 2021,

---

[44] *See* https://www.efca.info/about-us/.

and Suat Seven of Cinven Group members of the EFCA Technical Committee include Ian Ellis,

who worked at Cinven Group until July of 2022, Marko Kaisanlahti of Cinven Group, Franz

Wombacher of Sika, Trond Solbo of Sika, Osman Tezel of Saint-Gobain Group, Jean-Philippe

Bigas of Saint-Gobain Group, and Robert Hurkmans of Saint-Gobain Group. Members of the

EFCA Environmental Committee (which is also referred to as the Sustainability Committee)

include Marko Kaisanlahti of Cinven Group, Maxime Julliot of Cinven Group, Mark Schneider,

who worked for Sika until October of 2022, Bjorn Stockmann of Sika, Anders Larsson of Sika,

and Osman Tezel of Saint-Gobain Group.

     **72.**    Defendants are members of the following national CCA trade associations:

     **73.**    Spanish CCA trade association ("ANFAH"): CHRYSO, Master Builders

Solutions and Sika.[45] ANFAH members represent "around 90% of the admixtures used in

Spain."[46]

     **74.**    Belgium CCA trade association ("FIPAH"): CHRYSO, Master Builders Solutions

and Sika. Its website declares that it was founded "with the aim of promoting the common

interests of the 'Concrete and Mortar Admixtures Industry.'"[47]

     **75.**    France CCA trade association ("SYNAD"): CHRYSO, Master Builders Solutions,

GCP and Sika.[48] One of SYNAD's stated goals is to "to establish a relationship between all

market players." SYNAD representatives currently serving on EFCA committees include Claude

---

[45]   *See* https://anfah.org/.

[46]   EFCA, Spain – ANFAH, https://www.efca.info/efca-members/spain-anfah/.

[47]   *See* https://www.fipah.be/nl/.

[48]   *See* https://www.synad.fr/.

Le Fur, Jean-Philippe Bigas, and Maxime Julliot. Claude Le Fur worked at Sika from 2008 through July of 2021, and his last role was "Manager of Business Development for Europe South and Middle East." Jean-Philippe Bigas began working for Chryso in 2006 and has served as its "Technical Director in charge of regulatory aspects and sustainable development" since June of 2023.[49] Maxime Julliot works as a Market Manager at Cinven Group.

76.    United Kingdom CCA trade association ("CAA"): CHRYSO, GCP, Master Builders Solutions and Sika.[50] Two Cinven Group executives currently hold leadership positions in the CAA: Chris Fletcher, a Cinven Group Managing Director, is Chairman of the CAA Council, which "[e]stablishes and implements policy, promotes admixture use, [and] manages [CAA's] committees, task groups, and finances," while Ian Ellis, formerly a Cinven Group Technical Services Manager, is Chairman of the CAA Technical Committee, which "[s]upports work on UK and European Standards, Codes, and Certification [and] [p]romotes improvements in technical information, quality control, and level of technical support provided by CAA members."[51] Ian Ellis is also a member of the EFCA Technical Committee.

77.    Germany CCA trade association ("Deutsche Bauchemie e.V."): GCP, Master Builders Solutions and Sika[52]

78.    Italy CCA trade association ("ASSIAD"): CHRYSO, GCP, Master Builders

---

[49]    Jean Philippe Bigas, LinkedIn Profile, https://www.linkedin. com/in/jean-philippe-bigas-658a07b5/?originalSubdomain=fr.

[50]    *See* https://www.admixtures.org.uk/.
[51]    Cement Admixtures Association, CAA Structure, https://www.admixtures.org.uk/about-us/caa-structure/; Chris Fletcher, LinkedIn Profile, https://www.linkedin.com/in/chris-fletcher-84685137/?originalSubdomain=uk; Ian Ellis, LinkedIn Profile, https://www.linkedin.com/in/ian-ellis-72a94115/?originalSubdomain=uk.

[52]    *See* https://deutsche-bauchemie.de/.

Solutions, and Sika.[53] Part of ASSIAD's mission is to "bring together the interested companies or groups thereof to discuss issues of common interest." The ASSIAD website lists 11 "Consiglio Generale" members, including Leonardo Messaggi of Sika (President), Mario Casali of GCP, Donato Luciano of Chryso, and Roberto Spaggiari of Cinven Group.[54] On April 9, 2021, ASSIAD announced four new members of the ASSIAD Board, including Donato Luciano of Cinven Group, Jean Mascaro of Chryso, and Leonardo Messaggi of Sika. On July 21, 2023, ASSIAD announced that Leonardo Messaggi of Sika was elected President of ASSIAD for the period from 2023 to 2027. Leonardo Messaggi has worked for Sika since 2016 and currently serves as "Target Market Manager for Concrete & Industrial Flooring." In addition, Paolo Novello of Chryso serves as the Vice President of ASSIAD. On October 4, 2023, ASSIAD announced the creation of a new Technical Evolution Committee made up of 13 members, including Fabrizio Avallone and Cristiano Cereda of Sika, Mario Casali and Pietro Massinari of Chryso, and Ivana Torresan of Cinven Group. On October 5, 2023, Messaggi announced that the thirteen (13) members of the new Technical Evolution Committee would participate in roundtables at the first "General States of Concrete Technology" at SAIE Bari, an industry meeting, in October of 2023. Sika, Chryso, GCP, and Cinven Group were all scheduled to participate as "exhibitors" at this meeting.

      **79.** Netherlands CCA trade association ("VHB"): Master Builders Solutions and Sika.[55]

      **80.** Norway CCA trade association ("NCCA"): CHRYSO, Master Builders Solutions

---

[53] *See* https://www.assiad.it/.

[54] The Structure, https://www.assiad.it/LAssociazione/La-struttura.

[55] *See* https://www.vhb-hulpstoffen.nl/.

and Sika.[56] NCCA representatives currently serving on EFCA committees include Trond Solbo and Bjorn Stockmann, who both work for Sika. As explained herein, these Sika employees met with executives from other Defendants in their roles as EFCA committee members.

81.     Poland CCA trade association ("SPChB"): Master Builders Solutions and Sika.[57]

82.     Sweden CCA trade association ("SACA"): CHRYSO, Master Builders Solutions and Sika.[58] SACA representatives currently serving on EFCA committees include Anders Larsson, who works for Sika. As explained herein, Anders Larsson met with executives from other Defendants in his role as an EFCA committee member.

83.     Turkey CCA trade association ("KÜB"): CHRYSO, Master Builders Solutions and Sika.[59] KUB boasts that it "dominates 80% of the Turkish market," which itself makes up 40% of the total concrete admixture market in Europe. On March 13, 2020, KUB announced that Turgay Ozkun, a General Manager at Sika, had been elected as Chairman of the Board. At the same time, Osman Ilgen, a Vice President with Saint-Gobain Group, was electedas Vice President of the Board, and Suat Seven of Cinven Group was also elected to the Board. Osman Ilgen currently serves as both President of KUB and Vice President of EFCA.

84.     Switzerland CCA trade association ("FSHBZ"): Master Builders Solutions and Sika.[60]

---

[56]    *See* https://ncca.no/.

[57]    *See* https://spchb.pl/.

[58]    *See* https://www.saca.se/.

[59]    *See* https://kub.org.tr/.

[60]    *See* https://www.fshbz.ch/.

85.     Defendants' membership in the above trade associations provided many

opportunities both before and during the Class Period for Defendants to collude by discussing

competitive information regarding CCAs.

**E.    Defendants' Price Increases During the Class Period**

86.      Defendants have consistently raised their prices for CCAs, including through

surcharges, during the Class Period.

87.     These price increases were publicly announced.  For example, during an earnings

call in April of 2022,  RPM International, Inc. executive Michael Laroche pointed to the RPM

Group's concrete admixtures products  as one of the company's "fastest-growing businesses"

and cited "selling price increases" as a key growth factor.[61] One year later, in an earnings release

published in April of 2023, the RPM Group noted that "record" sales in its construction segment

were "driven by price increases and strength in concrete admixtures."[62] An investor report

published by the Saint-Gobain Group in February of 2021 cited "[u]pward trends in sales prices"

as a key driver of the company's sales growth in 2020.[63] The same report published one year later

similarly noted an "acceleration in prices in all segments" in 2021.[64] The report emphasized that

the Saint-Gobain Group had exhibited "strong pricing power and decisive execution" in raising

its prices by as much as 10% to match the industry trend. A press release published by the Saint-

---

[61]   *See* RPM, Q3 2022 Earnings Call Transcript (Apr. 6, 2022),
https://www.rpminc.com/media/3483/rpm- usq_transcript_2022- 04-06.pdf.

[62]   RPM, RPM Reports Record Fiscal 2023 Third-Quarter Results (Apr. 6, 2023),
https://www.rpminc.com/media/4672/q3- 23-rpm-earnings-release-final.pdf.

[63]   Saint-Gobain, FY 2020 Results and Outlook (Feb. 26, 2021), https://www.saint-
gobain.com/sites/saint- gobain.com/files/fy-2020-ang-a_0.pdf.

[64]   Saint-Gobain, FY 2021 Results and Outlook (Feb. 25, 2022), https://www.saint-
gobain.com/sites/saint- gobain.com/files/media/document/FY2021_ENG.pdf.

Gobain Group in October of 2021 included a chart showing an average price increase of 9.7% across all of its segments over the previous two years. In the Americas, Saint-Gobain's prices increased by 18.6% from October of 2019 to October of 2021.Defendants have also announced CCA price increases publicly during the Class Period. Examples are set forth below.

88.    On November 17, 2017, Sika announced price increases between 3 –5 percent on all products, effective January 1, 2018. The company stated that "raw material costs continue to escalate throughout 2017, largely due to rising critical major items such as propylene, polyols and other petrochemicals, as well as energy and transportation charges, according to the company. The press release stated that these increased costs have been reported in local and world news as well as the trade journals serving the adhesives and sealant industry.[65]

89.    In February of 2019, Sika CEO Paul Schuler announced that Sika would raise its prices for the second time that year: "We are going to increase prices further. We have increased prices in January, and we will do it again in March."[66]

90.    On November 13, 2020, Master Builders Solutions announced a 5-10% increase in the prices for liquid admixtures effective immediately.[67]

91.    On December 15, 2020, Saint-Gobain announced that it will implement a price increase of 1.9% across all product lines and brands effective January 1, 2021. [68] The press release stated that "in third-quarter 2021 the Group achieved a positive price impact of 8.7%

---

[65]    *See* https://glassbytes.com/2017/11/sika-industry-announces-price-increase/.

[66]    *See* https://www.reuters.com/article/sika-results-materials/sika-raises-prices-to-counter-jump-in-raw-material-costs-idUSZ8N1UN01Y/.

[67]    *See* https://mbcc.sika.com/en-sg/about-us/news/price-increase-announcement.

[68]    *See* https://www.master-abrasives.co.uk/news/2020/12/overview.aspx.

overall and of 8.1% for its industrial businesses alone."[69]

92.    On July 20, 2021, the Cinven Group announced that it would be increasing previously imposed surcharges on its products, including on CCAs, from six percent (6%) to nine percent (9%).[70]

93.    On October 11, 2021, Defendant Euclid announced a price increase for its line of concrete and masonry construction products, effective October 15, 2021. Rusty Maglionico, vice president of North American sales and marketing, stated that "in addition to significant supply challenges, raw material pricing and the cost of freight remain highly elevated."[71]

94.    On October 22, 2021, Sika announced that it was increasing output and raising prices to contend with a "sharp rise" in raw material costs that are squeezing profit margins.[72]

95.    On November 23, 2021, GCP announced it was implementing price increases for concrete admixtures in North America of up to 10% for all concrete admixture, effective January 1, 2022. David H. Campos, GCP's President of Specialty Construction Chemicals stated, "the global supply chain impacts on raw material and freight costs have been unprecedented over the past six months and input costs are not expected to subside in the near term. We have continued to increase our inventory levels to service our customer's needs and added freight capacity to

---

[69]    *See* https://www.saint-gobain.com/sites/saint-gobain.com/files/media/document/CP_CA_9M_2021_VA.pdf.

[70]    *See* https://www.negwer.com/Portals/0/Documents/Vendor%20News/2021%20Price%20Increases/2021_07_20_Master%20Builders%20Solutions%20Surcharge%20Letter_EN.pdf?ver=2021-07-21-080522-810.

[71]    *See* https://www.prnewswire.com/news-releases/euclid-chemical-announces-price-increase-due-to-continued-supply-chain-shortages-of-construction-materials-301397115.html.

[72]    *See* https://www.reuters.com/article/sika-results-update-2-chemicals-group-sika-tackles-higher-costs-by-raising-prices-idUKL4N2RI0XW/.

ensure timely supply."[73]

96.    In January 2022, Sika announced that it would be increasing surcharges on its products, including CCAs from sixteen percent (16%) to twenty percent (20%) effective February 1, 2022. [74]

97.    These announcements were publicly disseminated and, because of the critical role CCAs play in the construction industry, received substantial news coverage.

98.    Indeed, in an article published in August of 2020, an industry consultant noted that despite declining sales in the construction industry, the United States had seen an increase of eleven percent (11%) in the construction-cost-index (CCI), including a four percent (4%) increase in prices for products made of concrete.[75] He explained that "[t]he fall in prices feared in many branches, like automotive or plant engineering, is not noticeable in the construction sector." The consultant went on to suggest that players in construction-related industries would continue to raise their prices.

99.    Moreover, as shown below, the producer price index for ready-mix concrete, which includes the cost for various inputs including CCAs, has seen a sharp increase during the class period:

---

[73]    *See* https://www.forconstructionpros.com/concrete/equipment-products/concrete-materials/news/21915798/gcp-to-increase-admixture-prices-10-effective-january#:~:text=GCP%20announced%20it%20is%20implementing,products%20effective%20January%201%2C%202022.

[74]    *See* https://www.glenrockcompany.com/wp-content/uploads/2022/01/LtrForWebsite-Jasn272022.pdf

[75]    *See* https://www.zkg.de/en/artikel/zkg_Smart_pricing_strategies_in_the_pandemic-3562339.html.



**100.**    CCAs are critical inputs used in the manufacturing of ready-mix concrete. For example, a 2005 industry report by the Cement Admixture Association confirmed that as much as 75% of all ready mixed and precast concrete used by the industry contained one or more CCAs.[76] Another report from 2022 cited Sika and MBCC as the two largest UK suppliers of chemical admixtures, "which are critical [inputs] to the concrete manufacturing process' and that [s]trong rates of input-cost inflation had begun to delay [some ocnstruction] projects."[77]

**101.**    In sum, Defendants' price increases and surcharges have resulted in the prices for CCAs sold in the United States and its territories to increase dramatically during the Class Period. Specifically, prices for CCAs sold in the United States and its territories have roughly doubling during the Class Period.

**1.    Normal Market Forces Do Not Explain Defendants' Price Increases or Surcharges**

**102.**    Defendants have justified their price increases during the Class Period by citing

---

[76]  *See* https://www.constructionnews.co.uk/sections/news/additive-rise-for-concrete-22-09-2005/.

[77]  https://www.constructionnews.co.uk/legal/european-giants-offer-to-sell-uk-interests-to-allay-concrete-price-fears-25-10-2022/.

increases in input costs and supply chain constraints. For example, when Cinven Group raised prices for its CCAs by as much as 10% in November of 2020, the company blamed "supply constraints in key raw materials" and "an increase in raw material cost and several other related costs including freight." In explaining GCP's decision to raise its CCA prices by 10% in January of 2022, GCP Specialty Construction Chemicals President David Campos stated, "The global supply chain impacts on raw material and freight costs have been unprecedented over the past six months and input costs are not expected to subside in the near-term."[78] RPM's Laroche similarly justified price increases as necessary "to offset significant raw material inflationary pressure."[79]

103.    However, Defendants' material price increases for and imposition of surcharges on CCAs cannot be explained by normal market forces. The prices for other raw materials for CCAs have decreased during the Class Period. Similarly, ocean freight rates spiked sharply and briefly during Covid, particularly for trans-Atlantic cargo, but have since fallen dramatically.

104.    Raw materials cost increases alone do not explain Defendants' CCA price increases, including surcharges, during the Class Period. The timing and duration of the raw materials cost increases do not fully align with the CCA price increases. Moreover, while some CCA raw materials saw higher prices, others were flat or declined. Similarly, the increase in freight costs during Covid was short-lived, stabilizing after a few months before beginning to decrease. The duration of shipping cost increases does not explain the persistent increase in CCA prices, including surcharges, since 2019.

---

[78]    https://www.forconstructionpros.com/concrete/equipment-products/concrete-materials/news/21915798/gcp-to-increase-admixture-prices-10-effective-january#:~:text=GCP%20announced%20it%20is%20implementing,products%20effective%20January%201%2C%202022.

[79]    RPM, Q4 2022 Earnings Call Transcript (July25, 2022), https://www.rpminc.com /media /3784/rpm- usq_transcript_2022-07-25.pdf.

**105.**    For example, the price of a key raw material in the manufacturing of CCAs,

Polyethylene, declined significantly beginning in 2018:



### 2.    Defendants Have Admitted That Normal Market Forces Do Not Explain Their Price Increases or Surcharges

**106.**    Defendants have admitted that their higher profit margins were driven by price

increases that outpaced any increases in input costs.

**107.**    For example, during Saint-Gobain Group's earnings call in July of 2019, CFO

Sreedhar N. noted that Saint-Gobain Group had "remained focused on price in spite of … the fact

that there was a lower trend in the inflation." He explained that keeping prices high had helped the

company "not only to offset the inflation," but also to maintain a "positive spread" and,

therefore, increased profits. Over the next two years, Saint-Gobain Group continued to raise its

prices and increase its profits. A press release from October of 2021 explained that Saint-Gobain

Group was "confident that it w[ould] be able to offset raw material and energy cost inflation over

full-year 2021" given "the sharp 8.7% acceleration in prices" over the previous year, as well as

"the new price increase announcements in Europe and in the [United States]. Similarly, Sika

CFO Adrian Widmer admitted during an earnings call in February of 2020 that the impact of

increases in raw material costs was "only . . . marginal," and that Sika had continued to improve

its margin by remaining "very much . . . focused on pricing."[80] During another earnings call one

year later, Widmer explained that Sika's margin of 54.8% in 2020 was "supported by decreasing

raw material costs . . . in combination with disciplined pricing," which allowed it to "add[] 50

basis points in price effect."[81]

    **108.**    Similarly, Robert Sullivan, RPM's Chairman, President, and CEO touted its

company's ability to maintain high prices when asked by industry analysts whether it intended to

cut prices in the face of slumping demand:

> In the past cycles, we've been able to maintain the vast majority of the price
> increases that we've initiated, and we would expect to do exactly the same thing
> here. If you look at our performance in past commodity cycles on the down cycle,
> we should pick up $100 million to $200 million of margin benefit and we're
> working hard to do that, and we intend to do it.[82]

    **109.**    Several Defendants have cited their "pricing discipline" in explaining profit margin

increases to investors.

    **110.**    For example, Sika CEO Thomas Hasler explained that the "remarkable" increase

in Sika's material margin in the first half of 2023 was "a result of our pricing discipline and

---

[80]   Sika AG, Full Year 2019 Earnings Call Transcript (Feb. 21, 2020),
https://seekingalpha.com/article/4326363- sika-ag-sxyay-ceo-paul-schuler-on-full-year-2019-
results-earnings-call-transcript.

[81]   Sika AG, Q4 2020 Earnings Call Transcript (Feb. 20, 2021),
https://seekingalpha.com/article/4407686-sika-ag- sxyay-ceo-paul-schuler-on-q4-2020-results-
earnings-call-transcript (emphasis added).

[82]   RPM, Q2 2023 Earnings Call Transcript (Jan. 5, 2023),
https://www.rpminc.com/media/4564/rpm- usq_transcript_2023-01-05.pdf.

excellence."[83] This was echoed in Sika's 2023 Half-Year Report, which reported "disciplined sales price management," coupled with lower costs, as improving its gross margin.[84]

111.    Similarly, in an October of 2021 press release, Saint-Gobain Group cited a "[c]onstant focus on the price-cost spread" and "strong pricing discipline" as its "strategic priorities" for 2021.[85]

112.    And in July of 2023, when an analyst asked RPM's Sullivan what had driven the "significant increase" in profit margin for RPM's construction segment in the prior quarter, Sullivan boasted about RPM Group's pricing discipline: "[W]e had a few distributors that were hinting at … we can boost some product if you discount. And I think we held our pricing and held our discipline.  And let's say everybody held their breath until they needed inventory, and it started showing up in May. And that positive trend is continuing as we enter the first quarter.[86]"

## F.    The Structure and Characteristics of the Market for CCAs Support the Existence of a Conspiracy

113.    The structure and other characteristics of the market for CCAs make it conducive to anticompetitive conduct among Defendants and make collusion particularly attractive.

---

[83]    Sika AG, Q2 2023 Earnings Call Transcript (Aug. 4, 2023), https://seekingalpha.com/article/4624149-sika-ag-sxyay-q2-2023-earnings-call-transcript.

[84]    Sika, Half-Year Report (2023), 19 https://www.sika.com/content/dam/dms/corporate/media/glo-hy-2023-half-year-report.pdf?_gl=1*1smz2e5*_ga*MjA0NzgwMDU4NC4xNjk3ODI0MDYx*_ga_K04G1QB2XC*MTcwMDIzNDU 0NC40LjEuMTcwMDIzNDU2OS4wLjAuMA (emphasis added).

[85]    Saint-Gobain, Press Release (Oct. 28, 2021), https://www.saint-gobain.com/sites/saint-gobain.com/files/media/document/CP_CA_9M_2021_VA.pdf (emphasis added).

[86]    RPM Q4 2023 Earnings Call Transcript (Jul. 26, 2023), https://www.rpminc.com/media/4837/rpm-q4-23-transcript.pdf (emphasis added).

1.    **The Supply Side of the CCA Market Is Highly Concentrated, and the Defendants Are the Dominant Firms**

114.    The presence of a small group of major sellers is one of the conditions that the DOJ has identified as being favorable to collusion.[87] Put differently, a highly concentrated market is more susceptible to collusion and other anticompetitive practices than less concentrated markets.

115.    As the DOJ has noted, "mergers can reduce choices for consumers, workers, and other businesses, leaving them increasingly dependent on larger and more powerful firms that have purchased greater power to dictate the terms of their deals."[88] Indeed, the DOJ updated its Merger Guidelines in 2023 to better address the economic consequences of anticompetitive mergers because, as Attorney General Merrick Garland noted, "unchecked consolidation threatens the free and fair markets upon which our economy is based." [89]

116.    The Defendants that were targeted in dawn raids by European antitrust regulators, Defendants Sika, Saint-Gobain Group, and Cinven Group, are among the largest producers of CCAs in the World, as well as in the United States and its territories.[90] Other manufacturers of CCAs do not meaningfully compete with Defendants. Several of these other, smaller manufacturers of CCAs told the CMA that even if they wanted to compete with the Defendants,

---

[87]    Justice.gov, Price Fixing, Bid Rigging, and Market Allocation Schemes: What They Are and What to Look For, https://www.justice.gov/d9/pages/attachments/2016/01/05/211578.pdf.

[88]    Press Release, Office of Public Affairs, U.S. Department of Justice, Justice Department and Federal Trade Commission Seek to Strengthen Enforcement Against Illegal Mergers (Jan. 18, 2022).

[89]    Press Release, Office of Public Affairs, U.S. Department of Justice, Justice Department and FTC Seek Comment on Draft Merger Guidelines (July 19, 2023), https://www.justice.gov/opa/pr/justice-department-and-ftc-seek- comment-draft-merger- guidelines.

[90]    Industry ARC, Concrete Admixtures Market – Forecast 2023–2028, https://www.industryarc.com/Report/15114/concrete-admixtures-

they would not be able to do so effectively because of challenges in scaling up their operations, as well as the reluctance of CCA purchasers to switch from their existing CCA manufacturer(s). In fact, at least some of the Defendants' internal documents indicate that they consider the other Defendants to be their only close competitors.[91]

117.    Because the manufacture of CCAs is highly concentrated, with the Defendants controlling most of the production, this market is highly susceptible to collusion.

### 2.    Barriers to Entry Are High

118.    A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from supra-competitive pricing. When, however, there are significant barriers to entry, new entrants are much less likely to enter the market.

119.    There are high barriers to entry to effectively compete in the manufacture of CCAs, including the following: (a) the time and cost associated with effectively scaling CCAs manufacturing operations (i.e., building new production and storage facilities in closer proximity to CCA purchasers); (b) the research and development investment required to develop new products (i.e., polymers), and then support their introduction into the market; (c) sellers of the raw materials necessary to manufacture CCAs (i.e., polymers) favor the larger, entrenched manufacturers of CCAs; and (d) the long-standing, existing relationships between CCA manufacturers and customers.[92]

120.    These high barriers to entry are amplified by the difficulty purchasers of CCAs have

---

[91]   CMA, Phase 1 Referral Decision in Sika-Master Builders Merger, ¶ 89, 96, 101 (Sept. 23, 2022).

[92]   CMA, Phase 1 Referral Decision in Sika-Master Builders Merger, ¶ 89, 96, 101 (Sept. 23, 2022).

in switching manufacturers once selected. This is because smaller suppliers of CCAs cannot quickly build up their scale and capacity for potentially switching customers, and because supply contracts typically have a term of one to three years. Purchasers of CCAs thus face switching costs and are frequently locked-in to purchasing CCAs from the Defendants in this case – the three largest manufacturers and sellers of CCAs in the World, including in the United States and its territories.

121.    The high barriers to entry in the manufacture of CCAs make it unlikely that supra-competitive prices would result in new competitors entering the market. These high barriers to entry also make the market more susceptible to collusion.

### 3. The Demand Side of the CCA Market Is Unconcentrated

122.    The unconcentrated nature of the demand side of the CCA market also makes this market susceptible to collusion.

123.    In 2021, there were nearly 9,000 concrete and cement product manufacturing establishments in the United States and its territories.[93]

124.    Such a large number of buyers, each of which has a small share of the total marketplace, means that there is less incentive for Defendants to cheat on collusive pricing arrangements, since each potential sale is small while the risk of disrupting the collusive pricing agreement carries large penalties.

### 4. Demand for CCAs Is Inelastic

125.    Industries with inelastic demand are more susceptible to cartel behavior because of the potential for large increases in revenue resulting from the higher cartel prices. There are three primary characteristics that demonstrate the inelasticity of demand for CCAs: (a) a lack of

---

[93]    Census.Gov, 2021 CountyBusinessPatterns (CBP) Data, https://www.census.gov/programs- surveys/cbp/data/tables.html (last updated May 19, 2022).

substitute goods, (b) the essential nature of CCAs in cement, concrete, and mortar, and (c) CCAs being a small portion of the overall cost of the final good.

### 5.    There are No Substitutes for CCAs

126.    The DOJ has also recognized that standardized products which lack substitutes is a condition favorable to collusion, as substitute goods cannot restrain price increases and temper the effects of a price-fixing conspiracy.

127.    Purchasers of CCAs, or products containing CCAs, do not generally view them as interchangeable with other products, nor do purchasers view there as being substitutes for CCAs. In addition, the inclusion of CCAs is concrete and cement is, in practice, a necessity for the concrete and cement products to be used in the applications for which Plaintiff and members of the classes use those end-products.

### G.    Defendants' Fraudulently Concealed Their Conduct

128.    Plaintiff had no knowledge of the Defendants' anticompetitive conduct alleged herein, or of facts sufficient to place them on notice of the claims set forth herein, until, at the earliest, October 17, 2023, when the EC announced its investigation into the Defendants and that it was coordinating with the Turkish Competition Authority, the CMA, and the DOJ. As a result, Plaintiff did not discover, nor could it have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein before that date. Prior to October 17th, 2023, there was insufficient information to suggest that the Defendants were involved in a conspiracy to fix prices for CCAs.

129.    Therefore, the statute of limitation on the claims asserted herein was tolled by fraudulent concealment until at least October 17, 2023. Defendants affirmatively and wrongfully concealed their anticompetitive conduct since the beginning of the Class Period.

130.    Defendants' conspiracy was inherently self-concealing. The success of the

conspiracy depended on the Defendants and their co-conspirators keeping the price-fixing conduct alleged herein secret from customers and government authorities. Plaintiff reasonably believed it was purchasing CCAs in a competitive industry.

131.    Defendants and their co-conspirators also took affirmative steps to conceal the conspiracy and carry it out in a manner that would evade detection. For example, each Defendant has a "Code of Conduct" that appears to prohibit exactly the type of conduct they engaged in here.

132.    Because Defendants' anticompetitive conduct was both self-concealing and affirmatively concealed, Plaintiff did not learn or discover the operative facts giving rise to its claims until October 17, 2023. No information, actual or constructive, was ever made available to Plaintiff that would have led a reasonably diligent person to investigate whether a conspiracy in the market for CCAs existed prior to October 17, 2023.

133.    Moreover, because Plaintiff could not discover the existence of its claims prior to October 17, 2023, Plaintiff's claims did not accrue until that date.

## CLASS ACTION ALLEGATIONS

134.    Plaintiff brings this action on behalf of itself, and as a class action under the Federal Rules of Civil Procedure, Rule 23(a), (b)(2) and (b)(3), seeking injunctive relief pursuant to federal law, and damages pursuant to the antitrust, consumer protection, or unfair trade practices statutes of each of those jurisdictions where applicable (the "Illinois Brick Repealer States"), and under common law principles of unjust enrichment where recognized in such jurisdictions, on behalf of the members of the following classes (collectively, the "Classes"):

(A)    **Nationwide Injunctive Relief class:** All persons or entities in the United States that indirectly purchased CCAs that were manufactured by one or more of the Defendants, for their own use and not for resale, from at least January 1, 2018, to

such time as the anticompetitive effects of Defendants' conduct herein ceases.

**(B)**    **Arizona class:**  All persons or entities in Arizona that indirectly purchased CCAs that were manufactured by one or more of the Defendants, for their own use and not for resale, from at least January 1, 2018, to such time as the anticompetitive effects of Defendants' conduct herein ceases.

**(C)**    **Arkansas class:**  All persons or entities in Arkansas that indirectly purchased CCAs that were manufactured by one or more of the Defendants, for their own use and not for resale, from at least January 1, 2018, to such time as the anticompetitive effects of Defendants' conduct herein ceases.

**(D)**    **California class:**  All persons or entities in California that indirectly purchased CCAs that were manufactured by one or more of the Defendants, for their own use and not for resale, from at least January 1, 2018, to such time as the anticompetitive effects of Defendants' conduct herein ceases.

**(E)**    **District of Columbia class:**  All persons or entities in the District of Columbia that indirectly purchased CCAs that were manufactured by one or more of the Defendants, for their own use and not for resale, from at least January 1, 2018, to such time as the anticompetitive effects of Defendants' conduct herein ceases.

**(F)**    **Florida class:**  All persons or entities in Florida that indirectly purchased CCAs that were manufactured by one or more of the Defendants, for their own use and not for resale, from at least January 1, 2018, to such time as the anticompetitive effects of Defendants' conduct herein ceases.

**(G)**    **Guam class:**  All persons or entities in Guam that indirectly purchased CCAs that were manufactured by one or more of the Defendants, for their own use and

not for resale, from at least January 1, 2018, to such time as the anticompetitive effects of Defendants' conduct herein ceases.

**(H)**    **Hawaii class:**  All persons or entities in Hawaii that indirectly purchased CCAs that were manufactured by one or more of the Defendants, for their own use and not for resale, from at least January 1, 2018, to such time as the anticompetitive effects of Defendants' conduct herein ceases.

**(I)**    **Illinois class:**  All persons or entities in Illinois that indirectly purchased CCAs that were manufactured by one or more of the Defendants, for their own use and not for resale, from at least January 1, 2018, to such time as the anticompetitive effects of Defendants' conduct herein ceases.

**(J)**    **Iowa class:**  All persons or entities in Iowa that indirectly purchased CCAs that were manufactured by one or more the Defendants, for their own use and not for resale, from at least January 1, 2018, to such time as the anticompetitive effects of Defendants' conduct herein ceases.

**(K)**    **Kansas class:**  All persons or entities in Kansas that indirectly purchased CCAs that were manufactured by one or more of the Defendants, for their own use and not for resale, from at least January 1, 2018, to such time as the anticompetitive effects of Defendants' conduct herein ceases.

**(L)**    **Maine class:**  All persons or entities in Maine that indirectly purchased CCAs that were manufactured by one or more of the Defendants, for their own use and not for resale, from at least January 1, 2018, to such time as the anticompetitive effects of Defendants' conduct herein ceases.

**(M)**    **Massachusetts class:**  All persons or entities in Massachusetts that indirectly

purchased CCAs that were manufactured by one or more of the Defendants, for their own use and not for resale, from at least January 1, 2018, to such time as the anticompetitive effects of Defendants' conduct herein ceases.

**(N)**    **Michigan class:**  All persons or entities in Michigan that indirectly purchased CCAs that were manufactured by one or more of the Defendants, for their own use and not for resale, from at least January 1, 2018, to such time as the anticompetitive effects of Defendants' conduct herein ceases.

**(O)**    **Minnesota class:**  All persons or entities in Minnesota that indirectly purchased CCAs that were manufactured by one or more of the Defendants, for their own use and not for resale, from at least January 1, 2018, to such time as the anticompetitive effects of Defendants' conduct herein ceases.

**(P)**    **Mississippi class:**  All persons or entities in Mississippi that indirectly purchased CCAs that were manufactured by one or more of the Defendants, for their own use and not for resale, from at least January 1, 2018, to such time as the anticompetitive effects of Defendants' conduct herein ceases.

**(Q)**    **Missouri class:**  All persons or entities in Missouri that indirectly purchased CCAs that were manufactured by one or more of the Defendants, for their own use and not for resale, from at least January 1, 2018, to such time as the anticompetitive effects of Defendants' conduct herein ceases.

**(R)**    **Nebraska class:**  All persons or entities in Nebraska that indirectly purchased CCAs that were manufactured by one or more of the Defendants, for their own use and not for resale, from at least January 1, 2018, to such time as the anticompetitive effects of Defendants' conduct herein ceases.

**(S)**     **Nevada class:**  All persons or entities in Nevada that indirectly purchased CCAs that were manufactured by one or more of the Defendants, for their own use and not for resale, from at least January 1, 2018, to such time as the anticompetitive effects of Defendants' conduct herein ceases.

**(T)**     **New Hampshire class:**  All persons or entities in New Hampshire that indirectly purchased CCAs that were manufactured by one or more of the Defendants, for their own use and not for resale, from at least January 1, 2018, to such time as the anticompetitive effects of Defendants' conduct herein ceases.

**(U)**     **New Mexico class:**  All persons or entities in New Mexico that indirectly purchased CCAs that were manufactured by one or more of the Defendants, for their own use and not for resale, from at least January 1, 2018, to such time as the anticompetitive effects of Defendants' conduct herein ceases.

**(V)**     **New York class:**  All persons or entities in New York that indirectly purchased CCAs that were manufactured by one or more of the Defendants, for their own use and not for resale, from at least January 1, 2018, to such time as the anticompetitive effects of Defendants' conduct herein ceases.

**(W)**     **North Carolina class:**  All persons or entities in North Carolina that indirectly purchased CCAs that were manufactured by one or more of the Defendants, for their own use and not for resale, from at least January 1, 2018, to such time as the anticompetitive effects of Defendants' conduct herein ceases.

**(X)**     **North Dakota class:**  All persons or entities in North Dakota that indirectly purchased CCAs that were manufactured by one or more of the Defendants, for their own use and not for resale, from at least January 1, 2018, to such time as

the anticompetitive effects of Defendants' conduct herein ceases.

**(Y)**     **<u>Oregon class:</u>** All persons or entities in Oregon that indirectly purchased CCAs that were manufactured by one or more of the Defendants, for their own use and not for resale, from at least January 1, 2018, to such time as the anticompetitive effects of Defendants' conduct herein ceases.

**(Z)**     **<u>Rhode Island class:</u>** All persons or entities in Rhode Island that indirectly purchased CCAs that were manufactured by one or more of the Defendants, for their own use and not for resale, from at least January 1, 2018, to such time as the anticompetitive effects of Defendants' conduct herein ceases.

**(AA)**   **<u>South Carolina class:</u>** All persons or entities in South Carolina that indirectly purchased CCAs that were manufactured by one or more of the Defendants, for their own use and not for resale, from at least January 1, 2018, to such time as the anticompetitive effects of Defendants' conduct herein ceases.

**(BB)**   **<u>South Dakota class:</u>** All persons or entities in South Dakota that indirectly purchased CCAs that were manufactured by one or more of the Defendants, for their own use and not for resale, from at least January 1, 2018, to such time as the anticompetitive effects of Defendants' conduct herein ceases.

**(CC)**   **<u>Tennessee class:</u>** All persons or entities in Tennessee that indirectly purchased CCAs that were manufactured by one or more of the Defendants, for their own use and not for resale, from at least January 1, 2018, to such time as the anticompetitive effects of Defendants' conduct herein ceases.

**(DD)**   **<u>Utah class:</u>** All persons or entities in Utah that indirectly purchased CCAs that were manufactured by one or more of the Defendants, for their own use and not

for resale, from at least January 1, 2018, to such time as the anticompetitive
effects of Defendants' conduct herein ceases.

**(EE)**    **Vermont class:**  All persons or entities in Vermont that indirectly purchased
CCAs that were manufactured by one or more of the Defendants, for their own
use and not for resale, from at least January 1, 2018, to such time as the
anticompetitive effects of Defendants' conduct herein ceases.

**(FF)**    **Virginia class:**  All persons or entities in Virginia that indirectly purchased
CCAs that were manufactured by one or more of the Defendants, for their own
use and not for resale, from at least January 1, 2018, to such time as the
anticompetitive effects of Defendants' conduct herein ceases.

**(GG)**    **West Virginia class:**  All persons or entities in West Virginia that indirectly
purchased CCAs that were manufactured by one or more of the Defendants, for
their own use and not for resale, from at least January 1, 2018, to such time as
the anticompetitive effects of Defendants' conduct herein ceases.

**(HH)**    **Wisconsin class:**  All persons or entities in Wisconsin that indirectly purchased
CCAs that were manufactured by one or more of the Defendants, for their own
use and not for resale, from at least January 1, 2018, to such time as the
anticompetitive effects of Defendants' conduct herein ceases.

135.    Excluded from the Classes are (i) Defendants and their subsidiaries, affiliates,
directors, officers, and employees, and (ii) all state and federal government entities and agencies,
including the Court and Court personnel.

136.    Each of the Classes is individually so numerous that joinder of all members is
impracticable.  Even though the exact number of members of each of the Classes is unknown at

this time, based on the nature of the trade and commerce involved, Plaintiff reasonably believes that there are at least thousands of members in each of the Classes and that their identities can be readily ascertained from records in the possession of Defendants and third parties.

137.    By their above-described anticompetitive conduct and wrongful actions, Defendants violated the rights of Plaintiff and each member of the Classes in the same way by overcharging for CCAs that, in turn, resulted in the infliction of antitrust injury, harm, and damages on Plaintiff's and each member of the Classes' businesses and property.

138.    Certain questions of law and fact common to the proposed Classes predominate over any questions affecting individual member of the Classes, including, *inter alia*:

    (i)    Whether the Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain, or stabilize the prices of CCAs sold in the United States?

    (ii)    The identity of the participants of the alleged conspiracy?

    (iii)    The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy?

    (iv)    Whether the alleged conspiracy violated federal antitrust laws and/or state antitrust, unfair competition, and/or consumer protection laws, as alleged in the following Claims for Relief?

    (v)    Whether the Defendants unjustly enriched themselves to the detriment of the Plaintiffs and the Classes, thereby entitling Plaintiffs and members of the Classes to disgorgement of all benefits derived by Defendants, as alleged in the following Claims for Relief?

    (vi)    Whether the conduct of the Defendants and their co-conspirators, as alleged in this Consolidated Amended Complaint, caused injury to the business or property of Plaintiffs and members of the Classes?

    (vii)    The effect of the alleged conspiracy on the prices of CCAs sold in the United States during the Class Period?

    (viii)    Whether Plaintiffs and the members of the Classes had any reason to know or suspect the conspiracy, or any means to discover the conspiracy?

    (ix)    Whether the Defendants and their co-conspirators fraudulently concealed the conspiracy's existence from Plaintiffs and members of the Classes?

(x)    The appropriate class-wide measure of damages for the Classes?

139.    Plaintiff's claims are typical of the claims of the members of the Classes because Plaintiff and the members of the Classes are all victims of the same above-described anticompetitive schemes involving CCAs perpetrated on them by Defendants.

140.    Plaintiff and its counsel will fairly and adequately represent the interests of the members of the Classes. Plaintiff has no interests antagonistic to, or in conflict with, the interests of any of the members of the Classes. Plaintiff's counsel are experienced in leading and prosecuting large multi-district antitrust class actions, and do not anticipate any difficulties in managing this action as a class action.

141.    A class action is superior to all other available methods for fairly and efficiently adjudicating Plaintiff's and members of the Classes' claims. Plaintiff and members of the Classes have been (and will continue to be) harmed, injured, and damaged as a direct and/or proximate result of Defendants' alleged anticompetitive conduct. Litigating this case as a class action is appropriate because (i) it will avoid a multiplicity of suits and the corresponding burden on the courts and Parties, (ii) it would be virtually impossible for all members of the Classes to intervene as individual parties-plaintiff in this action, and (iii) it will provide court oversight of the claims process once Defendants' liability is adjudicated.

142.    Certification, therefore, is appropriate under FED. R. CIV. P. 23(b)(3) because the above-described common questions of law or fact predominate over any questions affecting individual members of the Classes, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

143.    Certification also is appropriate under FED. R. CIV. P. 23(b)(2) because Defendants have acted (or refused to act) on grounds generally applicable to the Classes, thereby making equitable relief appropriate for the Classes as a whole.

144.     Certification also is appropriate under FED. R. CIV. P. 23(b)(1) because the prosecution of separate actions by individual Class Members would create a risk of establishing incompatible standards of conduct for Defendants. For example, individual actions could be dispositive of the interests of other Class Members who are not parties to such actions, and substantially impair or impede their ability to protect their interests.

145.     Defendants' alleged anticompetitive conduct is applicable to the Classes as a whole, for which Plaintiff seeks, *inter alia*, damages and other equitable remedies.

146.     Absent a class action, Defendants will retain the benefits of their wrongdoing despite seriously violating the law and inflicting actual and consequential antitrust injury, harm, and damages on Plaintiff and members of the Classes and their property and businesses.

## DEFENDANTS' ONGOING AND CONTINUING ANTITRUST VIOLATIONS

147.     A continuing violation operates in two ways: (i) it restarts the statute of limitations period each time Defendants commit an overt act, and (ii) it occurs where, as here, Defendants' anticompetitive conduct causes a continuing harm to Plaintiff and members of the Classes. Defendants Inflicted New and Accumulating Injury on Plaintiff and Members of the Classes.

148.     Plaintiff and members of the Classes purchased CCAs indirectly from Defendants, from the beginning of the Class Period until the present and will continue to do so in the future.

149.     Each such purchase by Plaintiff and members of the Classes at a price that was higher, or will be higher in the future, resulting from Defendants' price fixing scheme necessarily caused Plaintiff to suffer new and accumulating injury, harm, and damages.

150.     As the concept of a continuing violation applies to a scheme that brings about a series of unlawfully high-priced sales over several years, each sale of CCAs starts the statutory

period running again, regardless of Plaintiff's and/or members of the Classes' knowledge about the unlawful CCA price fixing scheme at an earlier time. This means that each illegally priced sale of CCAs to Plaintiff and members of the Classes created a new cause of action for purposes of the statute of limitations.

151.    Defendants' price fixing scheme continued into the period four years before the filing of the first indirect purchaser class action complaint.

152.    Defendants and their distributors and retailers constantly coordinated and communicated with each other beginning in 2018 and through the present. Including in this manner, Defendants' CCA price fixing scheme continued when their CCA sales to Plaintiff and members of the Classes were made during the period four years preceding the filing of the first indirect purchaser class action complaint.

153.    Defendants' CCA price fixing scheme were intended to and, in fact, did inflict continuing injury, harm, and damages on Plaintiff's and members of the Classes' members businesses and property.

## CLAIMS AND CAUSES OF ACTION

### COUNT ONE
### VIOLATION OF § 1 OF THE SHERMAN ACT (15 U.S.C. § 1)
**(Against All Defendants)**
**Injunctive Relief Only**

154.    The preceding factual statements and allegations are incorporated by reference.

155.    Defendants violated Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, by entering into and engaging in a contract, combination, or conspiracy with regards to CCAs in unreasonable restraint of trade in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

156.    Defendants' violations of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1,

injured, harmed, and damaged Plaintiff and the Nationwide Injunctive Relief Class in their businesses or property. Plaintiff's and the Nationwide Injunctive Relief Class's damages consist of paying higher prices for CCAs than they otherwise would have paid in a free, open, and competitive market across the distribution channels. Such injury, harm, and damages, also known as "overcharges," are of the type that the antitrust laws are designed to prevent, and it flows from Defendants' alleged anticompetitive and unlawful conduct.

157.    At all relevant times, Defendants possessed market power in the relevant markets for each of the CCAs. But for Defendants' wrongful conduct, as alleged herein, genuine competition from generic manufacturers for each of such CCAs would have greatly reduced retail prices at all points across the distribution channel, including the prices paid by Plaintiff and members of the Classes.

158.    There is and was no legitimate, non-pretextual, pro-competitive business justification for Defendants' anticompetitive conduct that outweighs its harmful effect on CCA purchasers and competition. Defendants' conduct can only be explained by anticompetitive motives and a desire to foreclose competition in the markets for CCAs. Any supposed procompetitive benefits are false and pretextual and/or could have been achieved in a less restrictive manner.

159.    As a direct and/or proximate result of Defendants' anticompetitive conduct involving the CCAs, Plaintiff and members of the Nationwide Injunctive Relief Class have been (and will continue to be) harmed.

160.    As a direct, material, and/or proximate result of Defendants' violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, Plaintiff and members of the Nationwide Injunctive Relief Class have suffered (and will continue to suffer) injury and harm to their business or

property.

161.    Defendants' unlawful anticompetitive conduct continues and, unless restrained, will continue. Unless and until their wrongful conduct is enjoined, Plaintiff and members of the Nationwide Injunctive Relief Class will continue to suffer immediate and irreparable injury for which they are without an adequate remedy at law. Plaintiff and members of the Nationwide Injunctive Relief Class, therefore, are entitled to an injunction against Defendants preventing and restraining further antitrust violations, under Section 16 of the Clayton Act, 15 U.S.C. § 26.

## VIOLATIONS OF STATE ANTITRUST AND UNFAIR COMPETITION LAWS

162.    Plaintiff incorporates and re-alleges the allegations in the preceding paragraphs.

163.    Defendants' anticompetitive conduct violated the state antitrust and unfair competition laws of the states listed below, causing direct and proximate harm to the money, business, or property of the members of the Classes for the states listed below.

## COUNT TWO
### Violation of Arizona's Uniform State Antitrust Act (Ariz. Rev. Stat. §§ 44-1401, et seq.)
### (Against All Defendants)

164.    By reason of the conduct alleged herein, Defendants have violated Arizona Rev. Stat. §§ 44-1401, *et seq*.

165.    Each Defendant entered into a contract, combination, or conspiracy between two or more persons in restraint of trade or commerce in the relevant markets, a substantial part of which occurred within Arizona.

166.    Defendants' violations of Arizona law were flagrant.

167.    Defendants' unlawful conduct substantially affected Arizona's trade and commerce.

168.    As a direct and proximate cause of Defendants' unlawful conduct, the members of the Arizona Class have been injured in their business or property and are threatened with further

injury.

169.    By reason of the foregoing, the Arizona Class is entitled to seek all forms of relief available under Arizona Revised Stat. §§ 44-1401, *et seq.*

**COUNT THREE**
**Violation of California's Cartwright Act (Cal. Bus. & Prof. Code § 16700, *et seq.*)**
**(Against All Defendants)**

170.    By reason of the conduct alleged herein, Defendants have violated California Bus. & Prof. Code §§ 16700, *et seq.*

171.    Each Defendant entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce as alleged herein in violation of California Bus. & Prof. Code §§ 16700, 16720, *et seq*. To maintain the price of CCAs at supra-competitive levels at the California Class's expense, each Defendant has combined and conspired to restrain and exclude competition in the relevant markets.

172.    Each Defendants' anticompetitive conduct was knowing and willful and constitutes a flagrant violation of §§ 16700, *et seq*.

173.    Injury to members of the California Class was a direct, foreseeable, and proximate result of Defendants' anticompetitive conduct.

174.    Members of the California Class have suffered irreparable harm and do not have an adequate remedy at law.  Accordingly, members of the California Class seek injunctive and equitable relief.

175.    As a direct and proximate result of Defendants' unlawful conduct, the members of the California Class have been injured in their business or property by paying more for CCAs than they otherwise would have paid but for Defendants' unlawful conduct. As a result of Defendants' violation of Section 16700, *et seq.*, the California Class seeks treble damages and the costs of suit, including reasonable attorneys' fees, pursuant to Section 16750(a).

**COUNT FOUR**
**Violation of the District of Columbia Antitrust Act (D.C. Code § 28-4501, *et seq.*)**
**(Against All Defendants)**

176.    By reason of the conduct alleged herein, Defendants have violated District of Columbia Code §§ 28-4501, *et seq*.

177.    Each Defendant entered into a contract or combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce in the relevant markets, a substantial part of which occurred within the District of Columbia.

178.    Defendants' unlawful conduct substantially affected the District of Columbia's trade and commerce.

179.    As a direct and proximate cause of Defendants' unlawful conduct, the members of the District of Columbia Class have been injured in their business or property and are threatened with further injury.

180.    By reason of the foregoing, the District of Columbia Class is entitled to seek all forms of relief available under District of Columbia Code §§ 28-4501, *et seq*.

**COUNT FIVE**
**Violation of the Guam Antitrust Law (Guam Code Ann. tit. 9 §§ 69.10, *et seq.*)**
**(Against All Defendants)**

181.    By reason of the conduct alleged herein, Defendants have violated the Guam Antitrust Law, Guam Code Ann. tit. 9 §§ 69.10, *et seq*.

182.    Each Defendant entered into a contract or combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce in the relevant markets, a substantial part of which occurred within Guam.

183.    Defendants' violations of Guam law were flagrant.

184.    Defendants' unlawful conduct substantially affected Guam's trade and commerce.

185.    As a direct and proximate cause of Defendants' unlawful conduct, the members of

the Guam Class have been injured in their business or property and are threatened with further injury.

186.    By reason of the foregoing, the Guam Class is entitled to seek all forms of relief available under Guam Code Ann. tit. 9 §§ 69.10, *et seq*.

## COUNT SIX
## Violation of the Illinois Antitrust Act (740 Ill. Comp. Stat. Ann. 10/3(1), *et seq.*)
### (Against All Defendants)

187.    By reason of the conduct alleged herein, Defendants have violated the Illinois Antitrust Act, 740 Ill. Comp. Stat. Ann. 10/3(1), *et seq*.

188.    Each Defendant entered into a contract or combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce in the relevant markets, a substantial part of which occurred within Illinois.

189.    Defendants' unlawful conduct substantially affected Illinois's trade and commerce.

190.    As a direct and proximate cause of Defendants' unlawful conduct, the members of the Illinois Class have been injured in their business or property and are threatened with further injury.

191.    By reason of the foregoing, the Illinois Class is entitled to seek all forms of relief available under 740 Ill. Comp. Stat. Ann. 10/3(1), *et seq*.

## COUNT SEVEN
## Violation of the Iowa Competition Law (Iowa Code §§ 553.1, *et seq.*)
### (Against All Defendants)

192.    By reason of the conduct alleged herein, Defendants have violated Iowa Code §§ 553.1, *et seq*.

193.    Each Defendant entered into a contract or combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce in the relevant markets, a substantial

part of which occurred within Iowa.

194.    Defendants' violations of Iowa law were flagrant.

195.    Defendants' unlawful conduct substantially affected Iowa's trade and commerce.

196.    As a direct and proximate cause of Defendants' unlawful conduct, the members of the Iowa Class have been injured in their business or property and are threatened with further injury.

197.    By reason of the foregoing, the Iowa Class is entitled to seek all forms of relief available under Iowa Code §§ 553.1, *et seq*.

## COUNT EIGHT
### Violation of the Kansas Restraint of Trade Act (Kan. Stat. Ann. § 50-101, *et seq.*)
### (Against All Defendants)

198.    By reason of the conduct alleged herein, Defendants have violated the Kansas Restraint of Trade Act, Kan. Stat. Ann. § 50-101, *et seq*.

199.    Each Defendant entered into a contract or combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce in the relevant markets, a substantial part of which occurred within Kansas.

200.    Defendants entered into arrangements, contracts, agreements, trusts, or combinations with at least one other person with a view or which tend to preclude full and free competition in the importation, transportation, or sale of CCAs in Kansas.

201.    Defendants' unlawful conduct substantially affected Kansas's trade and commerce.

202.    As a direct and proximate cause of Defendants' unlawful conduct, the members of the Kansas Class have been injured in their business or property and are threatened with further injury.

203.    By reason of the foregoing, the Kansas Class is entitled to seek all forms of relief

available under Kansas Stat. Ann. §§ 50-101, *et seq.*

**COUNT NINE**
**Violation of Maine's Antitrust Statute (Me. Rev. Stat. Ann. Tit. 10, §§ 1101, *et seq.*)**
**(Against All Defendants)**

204.    By reason of the conduct alleged herein, Defendants have violated Maine's Antitrust Statute, Me. Rev. Stat. Ann. Tit. 10, §§ 1101, *et seq.*

205.    Each Defendant entered into a contract or combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce in the relevant markets, a substantial part of which occurred within Maine.

206.    Defendants' unlawful conduct substantially affected Maine's trade and commerce.

207.    As a direct and proximate cause of Defendants' unlawful conduct, the members of the Maine Class have been injured in their business or property and are threatened with further injury.

208.    By reason of the foregoing, the Maine Class is entitled to seek all forms of relief available under Me. Rev. Stat. Ann. tit. 10, §§ 1101, *et seq.*

**COUNT TEN**
**Violation of the Michigan Antitrust Reform Act (Mich. Comp. Laws §§ 445.771, *et seq.*)**
**(Against All Defendants)**

209.    By reason of the conduct alleged herein, Defendants have violated the Michigan Antitrust Reform Act, Michigan Comp. Laws. Ann. §§ 445.771, *et seq.*

210.    Each Defendant entered into a contract or combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce in the relevant markets, a substantial part of which occurred within Michigan.

211.    Defendants' unlawful conduct substantially affected Michigan's trade and commerce.

**212.**    As a direct and proximate cause of Defendants' unlawful conduct, the members of the Michigan Class have been injured in their business or property and are threatened with further injury.

**213.**    By reason of the foregoing, the Michigan Class is entitled to seek all forms of relief available under Michigan Comp. Laws. Ann. §§ 445.771, *et seq.*

**COUNT ELEVEN**
**Violation of the Minnesota Antitrust Law (Minn. Stat. §§ 325D.49, *et seq.*)**
**(Against All Defendants)**

**214.**    By reason of the conduct alleged herein, Defendants have violated the Minnesota Antitrust Law, Minn. Stat. §§ 325D.49, *et seq.*

**215.**    Each Defendant entered into a contract or combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce in the relevant markets, a substantial part of which occurred within Minnesota.

**216.**    Defendants' unlawful conduct substantially affected Minnesota's trade and commerce.

**217.**    As a direct and proximate cause of Defendants' unlawful conduct, the members of the Minnesota Class have been injured in their business or property and are threatened with further injury.

**218.**    By reason of the foregoing, the Minnesota Class is entitled to seek all forms of relief available under Minn. Stat. §§ 325D.49, *et seq.*

**COUNT TWELVE**
**Violation of the Mississippi Antitrust Statute (Miss. Code Ann. §§ 75-21-1, *et seq.*)**
**(Against All Defendants)**

**219.**    By reason of the conduct alleged herein, Defendants have violated the Mississippi Antitrust Statute, Miss. Code Ann. §§ 75-21-1, *et seq.*

**220.**    Defendants combined, contracted, understood and agreed in the relevant markets,

61

in a manner inimical to public welfare, with the effect of restraining trade, increasing the price of CCAs and hindering competition in the sale of CCAs, in violation of Miss. Code Ann. § 75-21-1(a), *et seq.*

221.     Defendants' unlawful conduct substantially affected Mississippi's trade and commerce.

222.     As a direct and proximate cause of Defendants' unlawful conduct, the members of the Mississippi Class have been injured in their business or property and are threatened with further injury.

223.     By reason of the foregoing, the Mississippi Class is entitled to seek all forms of relief available under Mississippi Code Ann. §§ 75-21-1, *et seq.*

## COUNT THIRTEEN
### Violation of the Missouri Merchandising Practices Act (Mo. Ann. Stat. §§ 407.010, *et seq.*)
### (Against All Defendants)

224.     By reason of the conduct alleged herein, Defendants have violated the Missouri Merchandising Practices Act, Mo. Ann. Stat. §§ 407.010, *et seq.*

225.     Each Defendant entered into a contract or combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce in the relevant markets, a substantial part of which occurred within Missouri.

226.     Defendants' unlawful conduct substantially affected Minnesota's trade and commerce.

227.     As a direct and proximate cause of Defendants' unlawful conduct, the members of the Missouri Class have been injured in their business or property and are threatened with further injury.

228.     By reason of the foregoing, the Missouri Class is entitled to seek all forms of relief available under Mo. Ann. Stat. §§ 407.010, *et seq.*

**COUNT FOURTEEN**
**Violation of the Nebraska Junkin Act (Neb. Rev. Stat. §§ 59-801, *et seq.*)**
**(Against All Defendants)**

229.    By reason of the conduct alleged herein, Defendants have violated the Nebraska Junkin Act, Neb. Rev. Stat. §§ 59-801, *et seq.*

230.    Each Defendant entered into a contract or combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce in the relevant markets, a substantial part of which occurred within Nebraska.

231.    Defendants' unlawful conduct substantially affected Nebraska's trade and commerce.

232.    As a direct and proximate cause of Defendants' unlawful conduct, the members of the Nebraska Class have been injured in their business or property and are threatened with further injury.

233.    By reason of the foregoing, the Nebraska Class is entitled to seek all forms of relief available under Nebraska Rev. Stat. §§ 59-801, *et seq.*

**COUNT FIFTEEN**
**Violation of the Nevada Unfair Trade Practices Act (Nev. Rev. Stat. §§ 598A.010, *et seq.*)**
**(Against All Defendants)**

234.    By reason of the conduct alleged herein, Defendants have violated the Nevada Unfair Trade Practices Act, Nev. Rev. Stat. §§ 598A.010, *et seq.*

235.    Each Defendant entered into a contract or combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce in the relevant markets, a substantial part of which occurred within Nevada.

236.    Defendants' unlawful conduct substantially affected Nevada's trade and commerce.

237.    As a direct and proximate cause of Defendants' unlawful conduct, the members of

the Nevada Class have been injured in their business or property and are threatened with further injury.

238.    By reason of the foregoing, the Nevada Class is entitled to seek all forms of relief available under Nebraska Rev. Stat. §§ 59-801, *et seq.*

### COUNT SIXTEEN
### Violation of New Hampshire's Antitrust Statute (N.H. Rev. Stat. §§ 356:1, *et seq.*)
### (Against All Defendants)

239.    By reason of the conduct alleged herein, Defendants have violated New Hampshire's Antitrust Statute, N.H. Rev. Stat. §§ 356:1, *et seq*.

240.    Each Defendant entered into a contract or combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce in the relevant markets, a substantial part of which occurred within New Hampshire.

241.    Defendants' unlawful conduct substantially affected New Hampshire's trade and commerce.

242.    As a direct and proximate cause of Defendants' unlawful conduct, the members of the New Hampshire Class have been injured in their business or property and are threatened with further injury.

243.    By reason of the foregoing, the New Hampshire Class is entitled to seek all forms of relief available under New Hampshire Rev. Stat. §§ 356:1, *et seq.*

### COUNT SEVENTEEN
### Violation of the New Mexico Antitrust Act (N.M. Stat. Ann. §§ 57-1-1, *et seq.*)
### (Against All Defendants)

244.    By reason of the conduct alleged herein, Defendants have violated the New Mexico Antitrust Act, N.M. Stat. Ann. §§ 57-1-1, *et seq*.

245.    Each Defendant entered into a contract or combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce in the relevant markets, a substantial

part of which occurred within New Mexico.

246.    Defendants' unlawful conduct substantially affected New Mexico's trade and commerce.

247.    As a direct and proximate cause of Defendants' unlawful conduct, the members of the New Mexico Class have been injured in their business or property and are threatened with further injury.

248.    By reason of the foregoing, the New Mexico Class is entitled to seek all forms of relief available under New Mexico Stat. Ann. §§ 57-1-1, *et seq.*

### COUNT EIGHTEEN
### Violation of Section 340 of the New York General Business Law
### (New York Gen. Bus. Law §§ 340, *et seq.*)
### (Against All Defendants)

249.    By reason of the conduct alleged herein, Defendants have violated Section 340 of the New York General Business Law, New York Gen. Bus. Law §§ 340, *et seq.*

250.    Defendants' unlawful conduct substantially affected New York's trade and commerce.

251.    As a direct and proximate cause of Defendants' unlawful conduct, the members of the New York Class have been injured in their business or property and are threatened with further injury.

252.    By reason of the foregoing, the New York Class is entitled to seek all forms of relief available under New York Gen. Bus. Law §340, *et seq.*

### COUNT NINETEEN
### Violation of the North Carolina General Statutes (N.C. Gen. Stat. §§ 75-1, *et seq.*)
### (Against All Defendants)

253.    By reason of the conduct alleged herein, Defendants have violated the North Carolina General Statutes, N.C. Gen. Stat. §§ 75-1, *et seq.*

254.     Each Defendant entered into a contract or combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce in the relevant markets, a substantial part of which occurred within North Carolina.

255.     Defendants' unlawful conduct substantially affected North Carolina's trade and commerce.

256.     As a direct and proximate cause of Defendants' unlawful conduct, the members of the North Carolina Class have been injured in their business or property and are threatened with further injury.

257.     By reason of the foregoing, the North Carolina Class is entitled to seek all forms of relief available under North Carolina Gen. Bus. Law §340, *et seq.*

**COUNT TWENTY**
**Violation of the North Dakota Uniform State Antitrust Act**
**(N.D. Cent. Code §§ 51-08.1-01, *et seq.*)**
**(Against All Defendants)**

258.     By reason of the conduct alleged herein, Defendants have violated the North Dakota Uniform State Antitrust Act, N.D. Cent. Code §§ 51-08.1-01, *et seq.*

259.     Each Defendant entered into a contract or combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce in the relevant markets, a substantial part of which occurred within North Dakota.

260.     Defendants' violations of North Dakota law were flagrant.

261.     Defendants' unlawful conduct substantially affected North Dakota's trade and commerce.

262.     As a direct and proximate cause of Defendants' unlawful conduct, the members of the North Dakota Class have been injured in their business or property and are threatened with further injury.

263.    By reason of the foregoing, the North Dakota Class is entitled to seek all forms of relief available under North Dakota Cent. Code §§ 51-08.1-01, *et seq*.

## COUNT TWENTY-ONE
## Violation of the Oregon Antitrust Law (Or. Rev. Stat. §§ 646.705, *et seq.*)
### (Against All Defendants)

264.    By reason of the conduct alleged herein, Defendants have violated the Oregon Antitrust Law, Or. Rev. Stat. §§ 646.705, *et seq*.

265.    Each Defendant entered into a contract or combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce in the relevant markets, a substantial part of which occurred within Oregon.

266.    Defendants' unlawful conduct substantially affected Oregon's trade and commerce.

267.    As a direct and proximate cause of Defendants' unlawful conduct, the members of the Oregon Class have been injured in their business or property and are threatened with further injury.

268.    By reason of the foregoing, the Oregon Class is entitled to seek all forms of relief available under Oregon Rev. Stat. §§ 646.705, *et seq*.

## COUNT TWENTY-TWO
## Violation of the Rhode Island Antitrust Act (R.I. Gen. Laws §§ 6-36-1, *et seq.*)
### (Against All Defendants)

269.    By reason of the conduct alleged herein, Defendants have violated the Rhode Island Antitrust Act, R.I. Gen. Laws §§ 6-36-1, *et seq*.

270.    Each Defendant entered into a contract or combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce in the relevant markets, a substantial part of which occurred within Rhode Island.

271.    Defendants' unlawful conduct substantially affected Rhode Island's trade and

commerce.

272.     As a direct and proximate cause of Defendants' unlawful conduct, the members of the Rhode Island Class have been injured in their business or property and are threatened with further injury.

273.     By reason of the foregoing, the Rhode Island Class is entitled to seek all forms of relief available under R.I. Gen. Laws § 6-36-11, *et seq*.

**COUNT TWENTY-THREE**
**Violation of the South Dakota Antitrust Statute (S.D. Codified Laws §§ 37-1-3.1, *et seq.*)**
**(Against All Defendants)**

274.     By reason of the conduct alleged herein, Defendants have violated the South Dakota Antitrust Statute, S.D. Codified Laws §§ 37-1-3.1, *et seq*.

275.     Each Defendant entered into a contract or combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce in the relevant markets, a substantial part of which occurred within South Dakota.

276.     Defendants' unlawful conduct substantially affected South Dakota's trade and commerce.

277.     As a direct and proximate cause of Defendants' unlawful conduct, the members of the South Dakota Class have been injured in their business or property and are threatened with further injury.

278.     By reason of the foregoing, the South Dakota Class is entitled to seek all forms of relief available under South Dakota Codified Laws §§ 37-1-3.1, *et seq*.

**COUNT TWENTY-FOUR**
**Violation of the Tennessee Trade Practices Act (Tenn. Code Ann. §§ 47-25-101, *et seq.*)**
**(Against All Defendants)**

279.     By reason of the conduct alleged herein, Defendants have violated the Tennessee Trade Practices Act, Tenn. Code Ann. §§ 47-25-101, *et seq*.

280.    Each Defendant entered into arrangements, contracts, agreements, trusts, or combinations with persons or corporations made with a view to lessen, or which tend to lessen, full and free competition in the importation or sale of CCAs imported into Tennessee.

281.    Competition in the relevant markets was restrained, suppressed, and eliminated throughout Tennessee.

282.    Each Defendant has entered into arrangements, contracts, agreements, trusts, or combinations with persons or corporations designed to, or which tend to, advance or control the price or the cost to producers or consumers in the relevant markets throughout Tennessee.

283.    Defendants' unlawful conduct substantially affected Tennessee's trade and commerce.

284.    As a direct and proximate cause of Defendants' unlawful conduct, the members of the Tennessee Class have been injured in their business or property and are threatened with further injury.

285.    By reason of the foregoing, the Tennessee Class is entitled to seek all forms of relief available under Tennessee Code Ann. §§ 47-25-101, *et seq*.

### COUNT TWENTY-FIVE
### Violation of the Utah Antitrust Act (Utah Code Ann. §§ 76-10-3101, *et seq.*)
### (Against All Defendants)

286.    By reason of the conduct alleged herein, Defendants have violated the Utah Antitrust Act, Utah Code Ann. §§ 76-10-3101, *et seq*.

287.    Each Defendant entered into a contract or combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce in the relevant markets, a substantial part of which occurred within Utah.

288.    Defendants' unlawful conduct substantially affected Utah's trade and commerce.

289.    As a direct and proximate cause of Defendants' unlawful conduct, the members of

Utah Class have been injured in their business or property and are threatened with further injury.

290.    By reason of the foregoing, the Utah Class is entitled to seek all forms of relief available under Utah Code Ann. §§ 76-10-3101, *et seq.*

### COUNT TWENTY-SIX
### Violation of the West Virginia Antitrust Act (W. Va. Code §§ 47-18-1, *et seq.*)
### (Against All Defendants)

291.    By reason of the conduct alleged herein, Defendants have violated the West Virginia Antitrust Act, W. Va. Code §§ 47-18-1, *et seq.*

292.    During the Class Period, Defendants engaged in anticompetitive conduct alleged above, including a continuing contract, combination, or conspiracy in unreasonable restraint of trade and commerce within the intrastate commerce of West Virginia for the purpose of excluding competition, in violation of W. Va. Code § 47-18-1, *et seq.*

293.    Each Defendant entered into a contract, combination, or conspiracy between two or more persons in restraint of trade or commerce in the relevant markets, a substantial part of which occurred in West Virginia.

294.    Defendants' unlawful conduct substantially affected West Virginia's trade and commerce.

295.    As a direct and proximate cause of Defendants' unlawful conduct, the members of West Virginia Class have been injured in their business or property and are threatened with further injury.

296.    By reason of the foregoing, the West Virginia Class is entitled to seek all forms of relief available under West Virginia Code §§ 47-18-1, *et seq.*

### COUNT TWENTY-SEVEN
### Violation of the Wisconsin Antitrust Act (Wis. Stat. Ann. §§ 133.01, *et seq.*)
### (Against All Defendants)

297.    By reason of the conduct alleged herein, Defendants have violated the Wisconsin

Antitrust Act, Wis. Stat. Ann. §§ 133.01, *et seq.*

**298.**     Each Defendant entered into a contract or combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce in the relevant markets, a substantial part of which occurred within Wisconsin.

**299.**     Defendants' unlawful conduct substantially affected Wisconsin's trade and commerce.

**300.**     As a direct and proximate cause of Defendants' unlawful conduct, the members of Wisconsin Class have been injured in their business or property and are threatened with further injury.

**301.**     By reason of the foregoing, the Wisconsin Class is entitled to seek all forms of relief available under Wis. Stat. Ann. §§ 133.01, *et seq.*

### VIOLATIONS OF STATE CONSUMER PROTECTION & UNFAIR TRADE PRACTICES LAWS

**302.**     Plaintiff incorporates and re-alleges the allegations in the preceding paragraphs.

**303.**     Defendants' unfair, unconscionable, deceptive, false, or fraudulent acts or trade practices violated the state consumer protection and unfair trade practices statutes of the states listed below, causing direct and proximate harm to the money, business, or property of the members of the Classes for the states listed below.

### COUNT TWENTY-EIGHT
### Violation of the Arkansas Deceptive Trade Practices Act
### (Ark. Code Ann. §§ 4-88-101, *et seq.*)
### (Against All Defendants)

**304.**     By reason of the conduct alleged herein, Defendants have violated the Arkansas Deceptive Trade Practices Act, Ark. Code Ann. §§ 4-88-101, *et seq.*

**305.**     During the Class Period, Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of trade or commerce in the relevant

71

markets, a substantial part of which occurred within Arkansas.

306.    Defendants' conduct substantially affected Arkansas's trade and commerce.

307.    Defendants' conduct constitutes unconscionable, false, or deceptive acts or practices in violation of Ark. Code Ann. § 4-88-107(a)(10).

308.    Defendants' unconscionable, false, or deceptive acts or practices directly and proximately caused, and will continue to cause, members of the Arkansas Class to pay supracompetitive prices, injuring them in their business or property.

309.    Accordingly, members of the Arkansas Class seek actual damages and attorney's fees pursuant to Ark. Code Ann. § 4-88-113(f).

**COUNT TWENTY-NINE**
**Violation of California's Unfair Competition Law**
**(Cal. Bus. & Prof. Code §§ 17200, *et seq.*) (the "UCL")**
**(Against All Defendants)**

310.    By reason of the conduct alleged herein, Defendants have violated California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.*

311.    The violations of federal antitrust law set forth above also constitute violations of section 17200*, et seq.* of California Business and Professions Code.

312.    Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the UCL by engaging in the acts and practices specified above.

313.    This claim is instituted pursuant to sections 17203 and 17204 of California Business and Professions Code, to obtain restitution from these defendants for acts, as alleged herein, that violated the UCL.

314.    The defendants' conduct as alleged herein violated the UCL. The acts, omissions, misrepresentations, practices and non-disclosures of defendants, as alleged herein, constituted a

common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of the UCL, including, but not limited to, the violations of section 16720, *et seq.*, of California Business and Professions Code, set forth above.

315.    Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether in violation of section 16720, *et seq.*, of California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent.

316.    Plaintiff and members of the California Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by defendants as a result of such business acts or practices.

317.    The illegal conduct alleged herein is continuing and there is no indication that defendants will not continue such activity into the future.

318.    The unlawful and unfair business practices of defendants, and each of them, as described above, have caused and continue to cause Plaintiff and the members of the California Class to pay supracompetitive and artificially inflated prices for CCAs sold in the State of California. Plaintiff and the members of the California Class suffered injury in fact and lost money or property as a result of such unfair competition.

319.    Accordingly, members of the California Class seek restitution pursuant to Cal. Bus. & Prof. Code §§ 17203 and 17204, and attorneys' fees pursuant to Cal. Code Civ. Proc. § 1021.5, as this action was brought to enforce an important right affecting the public interest for a large class of persons, the necessity and financial burden of private enforcement are such as to make the award appropriate, and such fees should not in the interest of justice be paid out of the

recovery, if any.

## COUNT THIRTY
### Violation of the District of Columbia Consumer Protection Procedures Act
### (D.C. Code §§ 28-3901, *et seq.*)
### (Against All Defendants)

320. By reason of the conduct alleged herein, Defendants have violated the District of Columbia Consumer Protection Procedures Act, D.C. Code §§ 28-3901, *et seq*.

321. During the Class Period, Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of trade or commerce in the relevant markets, a substantial part of which occurred within the District of Columbia.

322. Defendants' conduct was an unfair method of competition, and an unfair or deceptive act or practice within the conduct of commerce within the District of Columbia.

323. Defendants' unlawful conduct substantially affected the District of Columbia's trade and commerce.

324. Defendants' unconscionable, false, or deceptive acts or practices directly and proximately caused, and will continue to cause, members of the District of Columbia Class to pay supracompetitive prices, injuring them in their business or property.

325. Accordingly, members of the District of Columbia Class seek all forms of relief, including treble damages or $1500 per violation (whichever is greater) plus punitive damages, reasonable attorney's fees and costs under D.C. Code § 28-3901, *et seq.*

## COUNT THIRTY-ONE
### Violation of the Florida Deceptive and Unfair Trade Practices Act
### (Fla. Stat. §§ 501.201(2), *et seq.*)
### (Against All Defendants)

326. By reason of the conduct alleged herein, Defendants have violated the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201(2), *et seq*.

327. During the Class Period, Defendants entered into a contract, combination, or

conspiracy between two or more persons in restraint of trade or commerce in the relevant markets, a substantial part of which occurred within Florida.

328.    Defendants' conduct was an unfair method of competition, and an unfair or deceptive act or practice within the conduct of commerce within Florida.

329.    Defendants' unlawful conduct substantially affected Florida's trade and commerce.

330.    Defendants' unconscionable, false, or deceptive acts or practices directly and proximately caused, and will continue to cause, members of the Florida Class to pay supracompetitive prices, injuring them in their business or property.

331.    Accordingly, members of the Florida Class seek all forms of relief, including injunctive relief pursuant to Florida Stat. §501.208 and declaratory judgment, actual damages, reasonable attorneys' fees and costs pursuant to Florida Stat. § 501.211.

**COUNT THIRTY-TWO**
**Violation of the Hawaii Revised Statutes (Hawaii Rev. Stat. Ann. §§ 480-1, *et seq.*)**
**(Against All Defendants)**

332.    By reason of the conduct alleged herein, Defendants have violated Hawaii Revised Statutes Annotated §§ 480-1, *et seq.*

333.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Hawaii Revised Statutes Annotated §§ 480-1, *et seq.*

334.    Defendants' unlawful conduct had the following effects: (1) CCA price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) prices for CCAs were, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) Plaintiff and members of the Hawaii Class were deprived of free and open competition; and (4) Plaintiff and members of the Hawaii Class paid supracompetitive, artificially inflated prices for CCAs.

**335.** During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce and consumers.

**336.** As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Hawaii Class have been injured and are threatened with further injury.

**337.** Accordingly, members of the Hawaii Class seek all forms of relief available under Haw. Rev. Stat. §§ 480, *et seq.*

**COUNT THIRTY-THREE**
**Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act**
**(815 Ill. Comp. Stat. Ann. §§ 505/10A, *et seq.*)**
**(Against All Defendants)**

**338.** By reason of the conduct alleged herein, Defendants have violated the Illinois Consumer Fraud and Deceptive Business Practices Act, Ill. Comp. Stat. Ann. §§ 505/10A, *et seq.*

**339.** During the Class Period, Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of trade or commerce in the relevant markets, a substantial part of which occurred within Illinois.

**340.** Defendants' conduct was an unfair method of competition, and an unfair or deceptive act or practice within the conduct of commerce within Illinois.

**341.** Defendants' conduct misled consumers, withheld material facts, and resulted in material misrepresentations to Plaintiff and members of the Classes.

**342.** Defendants' unlawful conduct substantially affected Illinois's trade and commerce.

**343.** Defendants' unconscionable, false, or deceptive acts or practices directly and proximately caused, and will continue to cause, members of the Illinois Class to pay supracompetitive prices, injuring them in their business or property.

**344.** Accordingly, members of the Illinois Class seek all forms of relief, including

actual damages or any other relief the Court deems proper under 815 Ill. Comp. Stat. Ann. 505/10A, *et seq.*

## COUNT THIRTY-FOUR
### Violation of the Maine Unfair Trade Practices Act (5 M.R.S. §§ 207, *et seq.*)
### (Against All Defendants)

345.    By reason of the conduct alleged herein, Defendants have violated the Maine Unfair Trade Practices Act, 5 M.R.S. §§ 207, *et seq.*

346.    Plaintiff reserves his right to bring a claim under 5 M.R.S. §§ 207, *et seq.* Pursuant to 5 M.R.S. § 213(1-A), Plaintiff mailed all Defendants on January 22, 2024, via certified mail, return receipt requested, Demand for Payment Letters. In accordance with the statute, these letters explained the unfair acts, the injury suffered, and requested relief from the Defendants within 30 days. If necessary, Plaintiff will amend to add specific claims under 5 M.R.S. §§ 207, *et seq.*

## COUNT THIRTY-FIVE
### Violation of the Massachusetts Consumer Protection Act
### (Mass. Gen. Laws Ch. 93A § 1, *et seq.*)
### (Against All Defendants)

347.    By reason of the conduct alleged herein, Defendants have violated the Massachusetts Consumer Protection Act, Mass. Gen. Laws Ch. 93A § 1, *et seq.*

348.    Plaintiff reserves his right to bring a claim under Mass. Gen. Laws Ch. 93A *et seq.* Pursuant to Mass. Gen. Laws Ch. 93A § 9, Plaintiffs mailed Defendants on January 22, 2024, via certified mail, return receipt requested, Demand for Payment Letters. In accordance with the statute, these letters explained the unfair acts, the injury suffered, and requested relief from the Defendants within 30 days. If necessary, Plaintiff will amend to add specific claims under Mass. Gen. Laws Ch. 93A *et seq.*

**COUNT THIRTY-SIX**
**Violation of the Michigan Consumer Protection Act**
**(Mich. Comp. Laws Ann. §§ 445.901, et seq.)**
**(Against All Defendants)**

349.    By reason of the conduct alleged herein, Defendants have violated the Michigan

Consumer Protection Act, Mich. Comp. Laws Ann. §§ 445.901, *et seq.*

350.    During the Class Period, Defendants entered into a contract, combination, or

conspiracy between two or more persons in restraint of trade or commerce in the relevant

markets, a substantial part of which occurred within Michigan.

351.    Defendants' conduct was conducted with the intent to deceive Michigan

consumers regarding the nature of Defendants' actions within the stream of Michigan commerce.

352.    Defendants' conduct was an unfair method of competition, and an unfair or

deceptive act or practice within the conduct of commerce within the State of Michigan.

353.    Defendants' conduct misled consumers, withheld material facts, and took

advantage of Plaintiff and members of the Classes' inability to protect themselves.

354.    Defendants' conduct misled consumers, withheld material facts, and resulted in

material misrepresentations to Plaintiff and members of the Classes.

355.    Defendants' unlawful conduct substantially affected Michigan's trade and

commerce.

356.    Defendants' unconscionable, false, or deceptive acts or practices directly and

proximately caused, and will continue to cause, members of the Michigan Class to pay

supracompetitive prices, injuring them in their business or property.

*357.*    Accordingly, members of the Michigan Class seek all forms of relief

available under Mich. Comp. Laws Ann. § 445.911.

## COUNT THIRTY-SEVEN
### Violation of the Minnesota Consumer Fraud Act (Minn. Stat. §§ 325F.68, *et seq.*)
### (Against All Defendants)

358.    By reason of the conduct alleged herein, Defendants have violated the Minnesota Consumer Fraud Act, Minn. Stat. §§ 325F.68, *et seq*.

359.    Defendants engaged in a deceptive trade practice with the intent to injure competitors and consumers through supracompetitive profits.

360.    Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Minnesota.

361.    Defendants' conduct, specifically in the form of fraudulent concealment of their horizontal agreement, created a fraudulent or deceptive act or practice committed by a supplier in connection with a consumer transaction.

362.    Defendants' unlawful conduct substantially affected Minnesota's trade and commerce.

363.    Defendants' conduct was willful.

364.    As a direct and proximate cause of Defendants' unlawful conduct, Plaintiff and the members of the Minnesota Class have been injured in their business or property and are threatened with further injury.

365.    Accordingly, members of the Minnesota Class seek all forms of relief, including damages, reasonable attorneys' fees and costs under Minn. Stat. § 325F.68, *et seq*. and applicable case law.

## COUNT THIRTY-EIGHT
### Violation of the Missouri Merchandising Practices Act (Mo. Ann. Stat. §§ 407.010, *et seq.*)
### (Against All Defendants)

366.    By reason of the conduct alleged herein, Defendants have violated the Missouri Merchandising Practices Act, Mo. Ann. Stat. §§ 407.010, *et seq*.

367.    During the Class Period, Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of trade or commerce in the relevant markets, a substantial part of which occurred within Missouri.

368.    Defendants engaged in a deceptive trade practice with the intent to injure competitors and consumers through supra-competitive profits.

369.    Defendants concealed, suppressed, and omitted to disclose material facts to Plaintiff and the members of the Missouri Class concerning Defendants' unlawful activities. The concealed, suppressed, and omitted facts would have been important to Plaintiff and the members of the Missouri Class as they relate to the cost of CCAs they purchased.

370.    Defendants' conduct concerning the price of CCAs was deceptive as it had the tendency or capacity to mislead Plaintiff and the members of the Missouri Class to believe that they were purchasing CCAs at prices established by a free and fair market.

371.    Defendants' unlawful conduct substantially affected Missouri commerce.

372.    As a direct and proximate cause of Defendants' unlawful conduct, Plaintiff and members of the Missouri Class suffered ascertainable loss of money or property.

373.    Accordingly, Plaintiffs and members of the Missouri Class seek all relief available under the MMPA, specifically Mo. Rev. Stat. § 407.020, as further interpreted by Title 15 of the Missouri Code of State Regulations, 15 CSR 60-7.010, et seq., 15 CSR 60-8.010, *et seq.*, and 15 CSR 60-9.010, *et seq.*, and Mo. Rev. Stat. § 407.025 which provides for the relief sought in this count.

### COUNT THIRTY-NINE
### Violation of the Nebraska Consumer Protection Act (Neb. Rev. Stat. §§ 59-1602, *et seq.*)
### (Against All Defendants)

374.    By reason of the conduct alleged herein, Defendants have violated the Nebraska Consumer Protection Act, Neb. Rev. Stat. §§ 59-1602, *et seq.*

**375.**    During the Class Period, Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of trade or commerce in the relevant markets, a substantial part of which occurred within Nebraska.

**376.**    Defendants' conduct was conducted with the intent to deceive Nebraska consumers regarding the nature of Defendants' actions within the stream of Nebraska commerce.

**377.**    Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Nebraska.

**378.**    Defendants' conduct misled consumers, withheld material facts, and had a direct or indirect impact upon Plaintiff and members of the Nebraska Class's ability to protect themselves.

**379.**    Defendants' unlawful conduct substantially affected Nebraska's trade and commerce.

**380.**    Defendants' unconscionable, false, or deceptive acts or practices directly and proximately caused, and will continue to cause, members of the Nebraska Class to pay supracompetitive prices, injuring them in their business or property.

**381.**    Accordingly, members of the Nebraska Class seek actual damages, costs of suit, attorney's fees, and any other award of damages authorized by Neb. Rev. Stat. § 59-1609.

**COUNT FORTY**
**Violation of the Nevada Deceptive Trade Practices Act (Nev. Rev. Stat. §§ 598.0903, _et seq._)**
**(Against All Defendants)**

**382.**    By reason of the conduct alleged herein, Defendants have violated the Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. §§ 598.0903, _et seq_.

**383.**    Defendants engaged in a deceptive trade practice with the intent to injure competitors and to substantially lessen competition.

**384.**    Defendants' conduct was unfair, unconscionable, or deceptive within the conduct

of commerce within the State of Nevada.

385.    Defendants' conduct amounted to a fraudulent act or practice committed by a

supplier in connection with a consumer transaction.

386.    Defendants' unlawful conduct substantially affected Nevada's trade and

commerce.

387.    Defendants' conduct was willful.

388.    As a direct and proximate cause of Defendants' unlawful conduct, the members of

the Nevada Class have been injured in their business or property and are threatened with further

injury.

389.    Accordingly, members of the Nevada Class seek all forms of relief including

damages, reasonable attorneys' fees and costs, and a civil penalty of up to $5,000 per violation

under Nev. Rev. Stat. § 598.0993.

**COUNT FORTY-ONE**
**<u>Violation of the New Hampshire Consumer Protection Act</u>**
**<u>(N.H. Rev. Stat. Ann. Tit. XXXI §§ 358-A, *et seq.*)</u>**
**(Against All Defendants)**

390.    By reason of the conduct alleged herein, Defendants have violated the New

Hampshire Consumer Protection Act, N.H. Rev. Stat. Ann. Tit. XXXI §§ 358-A, *et seq.*

391.    Defendants engaged in a deceptive trade practice with the intent to injure

competitors and to substantially lessen competition.

392.    Defendants' conduct was conducted with the intent to deceive New Hampshire

consumers regarding the nature of Defendants' actions within the stream of New Hampshire

commerce.

393.    Defendants' conduct was unfair or deceptive within the conduct of commerce

within the State of New Hampshire.

394.     Defendants' conduct was willful and knowing.

395.     Defendants' conduct misled consumers, withheld material facts, and had a direct or indirect impact upon Plaintiff and members of the New Hampshire Class's ability to protect themselves.

396.     Defendants' unlawful conduct substantially affected New Hampshire's trade and commerce.

397.     As a direct and proximate cause of Defendants' unlawful conduct, Plaintiff and the members of the New Hampshire Class have been injured in their business or property and are threatened with further injury.

398.     Accordingly, members of the New Hampshire Class seek all forms of relief available under N.H. Rev. Stat. Ann. tit. XXXI, §§ 358-A:10 and 358-A:10-a.

**COUNT FORTY-TWO**
**Violation of the New Mexico Unfair Trade Practices Act**
**(N.M. Stat. Ann. §§ 57-12-3, *et seq.*)**
**(Against All Defendants)**

399.     By reason of the conduct alleged herein, Defendants have violated the New Mexico Unfair Trade Practices Act, N.M. Stat. Ann. §§ 57-12-3, *et seq.*

400.     Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of New Mexico.

401.     Defendants' conduct misled consumers, withheld material facts, and resulted in material misrepresentations to Plaintiff and members of the New Mexico Class.

402.     Defendants' unlawful conduct substantially affected New Mexico's trade and commerce.

403.     Defendants' conduct constituted "unconscionable trade practices" in that such conduct, inter alia, resulted in a gross disparity between the value received by the New Mexico

Class members and the price paid by them for CCAs as set forth in N.M. Stat. Ann. § 57-12-2E.

404.    Defendants' conduct was willful.

405.    As a direct and proximate cause of Defendants' unlawful conduct, Plaintiff and the members of the New Mexico Class have been injured in their business or property and are threatened with further injury.

406.    Accordingly, members of the New Mexico Class seek all forms of relief, including actual damages or up to $300 per violation, whichever is greater, plus reasonable attorney's fees under N.M. Stat. Ann. §§ 57-12-10.

**COUNT FORTY-THREE**
**Violation of the North Carolina Unfair Trade and Business Practices Act**
**(N.C. Gen. Stat. §§ 75-1.1, *et seq.*)**
**(Against All Defendants)**

407.    By reason of the conduct alleged herein, Defendants have violated the North Carolina Unfair Trade and Business Practices Act, N.C. Gen. Stat. §§ 75-1.1, *et seq*.

408.    Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of North Carolina.

409.    Defendants' trade practices are and have been immoral, unethical, unscrupulous, and substantially injurious to consumers.

410.    Defendants' conduct misled consumers, withheld material facts, and resulted in material misrepresentations to Plaintiff and members of the North Carolina Class.

411.    Defendants' unlawful conduct substantially affected North Carolina's trade and commerce.

412.    Defendants' conduct constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of North Carolina consumers in an

honest marketplace in which economic activity is conducted in a competitive manner.

413. As a direct and proximate cause of Defendants' unlawful conduct, Plaintiff and the members of the North Carolina Class have been injured in their business or property and are threatened with further injury.

414. Accordingly, members of the North Carolina Class seek all forms of relief, including treble damages under N.C. Gen. Stat. § 7516.

**COUNT FORTY-FOUR**
**Violation of the North Dakota Unfair Trade Practices Law**
**(N.D. Cent. Code §§ 51-10, *et seq.*)**
**(Against All Defendants)**

415. By reason of the conduct alleged herein, Defendants have violated the North Dakota Unfair Trade Practices Law, N.D. Cent. Code §§ 51-10, *et seq*.

416. Defendants engaged in a deceptive trade practice with the intent to injure competitors and consumers through supra-competitive profits.

417. Defendants' conduct amounted to a fraudulent or deceptive act or practice committed by a supplier in connection with a consumer transaction.

418. Defendants' unlawful conduct substantially affected North Dakota's trade and commerce.

419. Defendants' conduct was willful.

420. As a direct and proximate cause of Defendants' unlawful conduct, Plaintiff and the members of the North Dakota Class have been injured in their business or property and are threatened with further injury.

421. Accordingly, members of the North Dakota Class seek all forms of relief, including damages and injunctive relief under N.D. Cent. Code § 51-10-06.

## COUNT FORTY-FIVE
### Violation of the Oregon Unlawful Trade Practices Act (Or. Rev. Stat. §§ 646.605, *et seq.*)
### (Against All Defendants)

422.    By reason of the conduct alleged herein, Defendants have violated the Oregon Unlawful Trade Practices Act, Or. Rev. Stat. §§ 646.605, *et seq.*

423.    Defendants engaged in a deceptive trade practice with the intent to injure competitors and consumers through supracompetitive profits.

424.    Defendants' conduct was conducted with the intent to deceive Oregon consumers regarding the nature of Defendants' actions within the stream of Oregon commerce.

425.    Defendants' conduct was unfair or deceptive within the conduct of commerce within the State of Oregon.

426.    Defendants' conduct misled consumers, withheld material facts, and had a direct or indirect impact upon Plaintiff and members of the Oregon Class's ability to protect themselves.

427.    Defendants' unlawful conduct substantially affected Oregon's trade and commerce.

428.    As a direct and proximate cause of Defendants' unlawful conduct, Plaintiff and the members of the Oregon Class have been injured in their business or property and are threatened with further injury.

429.    Accordingly, members of the Oregon Class seek all forms of relief available under Or. Rev. Stat. § 646.638.

## COUNT FORTY-SIX
### Violation of the Rhode Island Deceptive Trade Practices Act
### (R.I. Gen. Laws §§ 6-13.1-1, *et seq.*)
### (Against All Defendants)

430.    By reason of the conduct alleged herein, Defendants have violated the Rhode

Island Deceptive Trade Practices Act, R.I. Gen. Laws §§ 6-13.1-1, *et seq*.

431.    Defendants engaged in a deceptive trade practice with the intent to injure competitors and consumers through supracompetitive profits.

432.    Defendants' conduct was unfair or deceptive within the conduct of commerce within the State of Rhode Island.

433.    Defendants' conduct amounted to an unfair or deceptive act or practice committed by a supplier in connection with a consumer transaction.

434.    Defendants' unlawful conduct substantially affected Rhode Island's trade and commerce.

435.    Defendants' conduct was willful.

436.    Defendants deliberately failed to disclose material facts to Plaintiff and members of the Rhode Island Class concerning Defendants' unlawful activities, including the horizontal conspiracy and artificially inflated prices for CCAs.

437.    Defendants' deception, including its affirmative misrepresentations and/or omissions concerning the price of CCAs, constitutes information necessary to Plaintiff and members of the Rhode Island Class relating to the cost of CCAs purchased.

438.    As a direct and proximate cause of Defendants' unlawful conduct, Plaintiff and the members of the Rhode Island Class have been injured in their business or property and are threatened with further injury.

439.    Accordingly, members of the Rhode Island Class seek all forms of relief, including actual damages or $200 per violation, whichever is greater, and injunctive relief and punitive damages under R.I. Gen Laws § 6-13.1-5.2.

## COUNT FORTY-SEVEN
## Violation of South Carolina's Unfair Trade Practices Act
### (S.C. Code Ann. §§ 39-5-10, *et seq.*)
### (Against All Defendants)

**440.**     By reason of the conduct alleged herein, Defendants have violated South

Carolina's Unfair Trade Practices Act, S.C. Code Ann. §§ 39-5-10, *et seq*.

**441.**     Defendants' conduct was conducted with the intent to deceive South Carolina

consumers regarding the nature of Defendants' actions within the stream of South Carolina

commerce.

**442.**     Defendants' conduct was unfair or deceptive within the conduct of commerce

within the State of South Carolina.

**443.**     Defendants' conduct misled consumers, withheld material facts, and had a direct

or indirect impact upon Plaintiff and members of the South Carolina Class's ability to protect

themselves.

**444.**     Defendants' conduct was willful.

**445.**     Defendants' unlawful conduct substantially affected South Carolina trade and

commerce.

**446.**     Defendants' deception, including its affirmative misrepresentations and/or

omissions concerning the price of CCAs, constitutes information necessary to Plaintiff and

members of the South Carolina Class relating to the cost of CCAs purchased.

**447.**     As a direct and proximate cause of Defendants' unlawful conduct, Plaintiff and

the members of the South Carolina Class have been injured in their business or property and are

threatened with further injury.

**448.**     Accordingly, members of the South Carolina Class seek all forms of relief,

including treble damages or and reasonable attorneys' fees and costs under S.C. Code Ann. § 39-

5-140.

## COUNT FORTY-EIGHT
### Violation of the South Dakota Deceptive Trade Practices and Consumer Protection Law (S.D. Codified Laws §§ 37-24, *et seq.*)
### (Against All Defendants)

**449.** By reason of the conduct alleged herein, Defendants have violated the South Dakota Deceptive Trade Practices and Consumer Protection Law, S.D. Codified Laws §§ 37-24, *et seq.*

**450.** Defendants engaged in a deceptive trade practice with the intent to injure competitors and consumers through supra-competitive profits.

**451.** Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of South Dakota.

**452.** Defendants' conduct amounted to a fraudulent or deceptive act or practice committed by a supplier in connection with a consumer transaction.

**453.** Defendants' unlawful conduct substantially affected South Dakota's trade and commerce.

**454.** Defendants' conduct was willful.

**455.** As a direct and proximate cause of Defendants' unlawful conduct, Plaintiff and the members of the South Dakota Class have been injured in their business or property and are threatened with further injury.

**456.** Accordingly, members of the South Dakota Class seek all forms of relief, including actual damages and injunctive relief under S.D. Codified Laws § 37-24-31.

## COUNT FORTY-NINE
### Violation of the Utah Consumer Sales Practices Act (Utah Code Ann. §§ 13-11-1, *et seq.*)
### (Against All Defendants)

**457.** By reason of the conduct alleged herein, Defendants have violated the Utah

Consumer Sales Practices Act, Utah Code Ann. §§ 13-11-1, *et seq*.

458.    Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Utah.

459.    Defendants' conduct and/or practices were unconscionable and were undertaken in connection with consumer transactions.

460.    Defendants knew or had reason to know that their conduct was unconscionable.

461.    Defendants' conduct misled consumers, withheld material facts, and resulted in material misrepresentations to Plaintiff and members of the Utah Class.

462.    Defendants' unlawful conduct substantially affected Utah's trade and commerce.

463.    As a direct and proximate cause of Defendants' unlawful conduct, Plaintiff and the members of the Utah Class have been injured in their business or property and are threatened with further injury.

464.    Accordingly, members of the Utah Class seek all forms of relief, including declaratory judgment, injunctive relief, and ancillary relief, pursuant to Utah Code Ann. §§ 13-11-19(5) and 13-11-20.

**COUNT FIFTY**
**Violation of the Utah Unfair Practices Act (Utah Code Ann. §§ 13-5-1, *et seq.*)**
**(Against All Defendants)**

465.    By reason of the conduct alleged herein, Defendants have violated the Utah Unfair Practices Act, Utah Code Ann. §§ 13-5-1, *et seq*.

466.    Defendants' conduct caused or was intended to cause unfair methods of competition within the State of Utah.

467.    Defendants' unlawful conduct substantially affected Utah's trade and commerce.

468.    As a direct and proximate cause of Defendants' unlawful conduct, Plaintiff and the members of the Utah Class have been injured in their business or property and are threatened

with further injury.

469.    Accordingly, members of the Utah Class seek all forms of relief, including actual damages or $2000 per Utah Class member, whichever is greater, plus reasonable attorney's fees under Utah Code Ann. §§ 13-5-14, *et seq.*

## COUNT FIFTY-ONE
### Violation of the Vermont Consumer Fraud Act (Vt. Stat. Ann. tit. 9 §§ 2453, *et seq.*)
#### (Against All Defendants)

470.    By reason of the conduct alleged herein, Defendants have violated the Vermont Consumer Fraud Act, Vt. Stat. Ann. tit. §§ 2453, *et seq.*

471.    Defendants' conduct caused or was intended to cause unfair methods of competition within the State of Vermont.

472.    Defendants' unlawful conduct substantially affected Vermont's trade and commerce.

473.    As a direct and proximate cause of Defendants' unlawful conduct, Plaintiff and the members of the Vermont Class have been injured in their business or property and are threatened with further injury.

474.    Accordingly, members of the Vermont Class seek all forms of relief, including actual damages, treble damages, and reasonable attorneys' fees.

## COUNT FIFTY-TWO
### Violation of the Virginia Consumer Protection Act (Va. Code Ann. §§ 59.1-196, *et seq.*)
#### (Against All Defendants)

475.    By reason of the conduct alleged herein, Defendants have violated the Virginia Consumer Protection Act, Va. Code Ann. §§ 59.1-196, *et seq.*

476.    Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Virginia.

477.    Defendants' conduct amounted to a fraudulent act or practice committed by a

supplier in connection with a consumer transaction.

**478.**    Defendants' unlawful conduct substantially affected Virginia's trade and commerce.

**479.**    Defendants' conduct was willful.

**480.**    As a direct and proximate cause of Defendants' unlawful conduct, Plaintiff and the members of the Virginia Class have been injured in their business or property and are threatened with further injury.

**481.**    Accordingly, members of the Virginia Class seek all forms of relief, including treble damages or $1000 per violation, whichever is greater, plus reasonable attorneys' fees and costs under Va. Code Ann. § 59.1-204(A), *et seq.*

**COUNT FIFTY-THREE**
**Violation of the West Virginia Consumer Credit and Protection Act**
**(W. Va. Code §§ 46A-6-101, *et seq.*)**
**(Against All Defendants)**

**482.**    By reason of the conduct alleged herein, Defendants have violated the West Virginia Consumer Credit and Protection Act, W. Va. Code §§ 46A-6-101, *et seq.*

**483.**    The violations of federal antitrust law set forth above also constitute violations of Sections 46A-6-101, *et seq.* of the West Virginia Code.

**484.**    Plaintiff reserves its right to bring a claim under W. Va. Code §§ 46A-6-101, *et seq.* Section § 46A-5-108 of the West Virginia Code, Plaintiff mailed notice to Defendants in the manner specified under the Code on January 22, 2024. Plaintiff has not received an offer to cure as of the date of this filing. If necessary, Plaintiff will amend to add specific claims under W. Va. Code §§ 46A-6-101, *et seq.*

**COUNT FIFTY-FOUR**
**VIOLATION OF STATE COMMON LAW UNJUST ENRICHMENT LAWS**
**(Against All Defendants)**

**485.**     Plaintiff incorporates and re-alleges the allegations in the preceding paragraphs.

**486.**     As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched by the receipt of unlawfully inflated prices and unlawful profits of CCAs.

**487.**     Under common law principles of unjust enrichment, Defendants should not be permitted to retain the benefits conferred on them by overpayments by Plaintiff and members of the classes in the following states: Arizona, Arkansas, California, District of Columbia, Florida, Guam, Hawaii, Illinois, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, Virginia, West Virginia, and Wisconsin.

**RELIEF REQUESTED**

**WHEREFORE,** Plaintiff respectfully requests the Court to certify this action as a class action, appoint it as the class representative, and appoint its counsel as Class counsel. Plaintiff further requests that Defendants be cited to appear and answer this action, and, upon final trial or hearing, judgment be entered that the above-described CCAs  price fixing scheme, and the above-described wrongful and anticompetitive acts engaged in by Defendants in furtherance thereof, violated Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1; 2, and Section 3 of the Clayton Act, a restraint of trade or commerce in violation of state antitrust and unfair competition laws alleged herein, violations of the state consumer protection and unfair trade practices laws alleged herein, violations of state common law unjust enrichment laws,  and further, judgment be entered, favor of Plaintiff and members of the Classes, and against Defendants, as follows:

(i)     that Plaintiff and Class members have been (and continue to be) injured in their businesses and property as a direct and/or proximate result of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1 and listed state antitrust laws, unfair competition laws, state consumer protection laws, and common law;

(ii)    that Plaintiff and members of the classes have been (and continue to be) injured in their businesses and property as a direct and/or proximate result of Defendants' violations of listed state antitrust laws, unfair competition laws, state consumer protection laws, and common law;

(iii)    damages, to the maximum extent allowed under the applicable state laws, and that a joint and several judgments in favor of Plaintiff and the members of the Classes be entered against defendants in an amount to be trebled to the extent such laws permit;

(iv)    permanent injunctive relief preventing Defendants from continuing their unlawful acts in violation of the Sherman Act;

(v)    their attorneys' fees, litigation expenses, and court costs through the trial and any appeals of this action;

(vi)    pre-judgment and post-judgment interest at the highest lawful rate; and

(vii)    such other and further relief to which Plaintiff and Class members are justly entitled.

## **JURY TRIAL DEMANDED**

Pursuant to FED. R. CIV. P. 38(b), Plaintiff demands a trial by jury of all issues so triable.

Date: January 22, 2024

Respectfully submitted,

*/s/ Robert N. Kaplan*
Robert N. Kaplan
Matthew P. McCahill
Elana Katcher
Jason A. Uris
**KAPLAN FOX & KILSHEIMER, LLP**
800 Third Avenue, 38th Floor
New York, New York 10022
T: (212) 687-1980
rkaplan@kaplanfox.com
mmccahill@kaplanfox.com
ekatcher@kaplanfox.com
juris@kaplanfox.com

John P. Marshall
Matthew S. Sullivan
**WHITE & ALLEN, P.A.**
106 South McLewean Street
PO Box 3169
Kinston, North Carolina 28501
T: (252) 527-8000
jmarshall@whiteandallen.com
msullivan@whiteandallen.com

**COUNSEL FOR PLAINTIFF AND THE
PUTATIVE CLASS**